**In re AUDIBILITY OF CERTAIN RECORDED CONVERSATIONS.**

**UNITED STATES of America**

**v.**

**Victor Manuel GERENA, et al.**

**Crim. No. H–85–50 (TEC).**

United States District Court, D. Connecticut.

Aug. 19, 1988.

---

590

Albert S. Dabrowski, Carmen Espinosa–Van Kirk, Office of the U.S. Atty., Hartford, Conn., for the Government.

Juan R. Acevedo, Hartford, Conn., Rafael Anglada–Lopez, New York City, Linda Backiel, Philadelphia, Pa., James Bergenn, F. Mac Buckley, Hartford, Conn., Michael Deutsch, Chicago, Ill., Richard J. Harvey, Ronald Kuby, New York City, Margaret P. Levy, Hartford, Conn., Diane Polan, Richard Reeve, New Haven, Conn., James L. Sultan, Boston, Mass., Leonard Weinglass, New York City, Jacob Wieselman, Hartford, Conn., John R. Williams, New Haven, Conn., for defendants.

Roberto J. Maldonado–Rivera pro se.

## RULING ON DEFENDANTS' OBJECTIONS TO ELECTRONIC SURVEILLANCE EVIDENCE ON GROUNDS OF INAUDIBILITY

JOSÉ A. CABRANES, District Judge:

### BACKGROUND

Almost three years ago, on August 28, 1985, the first defendants in this case were indicted for various offenses alleged to have been committed in connection with the September 12, 1983, robbery of approximately $7 million from a Wells Fargo office in West Hartford, Connecticut [1]—reported at that time to have been the second largest theft of cash in United States history.[2] Defendants are alleged to be associated with Los Macheteros, a clandestine paramilitary action group advocating independence for Puerto Rico.[3] A firm trial date has been set for September 6, 1988.

The government has indicated its intention to use in its case-in-chief certain electronic surveillance evidence obtained pursuant to judicial authorization—specifically, 193 conversations contained on 166 tapes and cassettes. Defendants have objected to the taped evidence on many grounds, one of which is that most of the conversations are so substantially inaudible as to render the balance of them untrustworthy and, hence, inadmissible.[4] The audibility

---

**1.** A superseding indictment, returned in March 1986, named sixteen of the original seventeen defendants and added three new defendants.

**2.** See N.Y. Times, Sept. 14, 1983, at B1, col. 1; id., Sept. 4, 1985, A25, col. 1.

**3.** See Superseding Indictment (filed Mar. 21, 1986) at Counts 14–16; United States v. Ojeda Rios, 846 F.2d 167, 168 (2d Cir.1988).

**4.** One of the challenges to the electronic surveillance evidence—on the ground that the tapes had not been timely sealed—has resulted in the suppression by Judge Clarie of 35 of the tapes which have also been challenged on the ground of inaudibility. See Ruling on the Defendants' Motion to Suppress Tape Recorded Evidence for Violation of 18 U.S.C. Sec. 2518(8)(a) (filed July 7, 1988). I have not considered the audibility objections to the tapes suppressed by that ruling.

There are numerous other issues which have been or may be raised concerning the use of electronic surveillance evidence, such as: whether a proper foundation can be laid for the admission of the tapes, whether a proper foundation can be laid for the provision of transcripts and translations to the jury, whether the transcripts or translations thus provided to the jury would themselves be aids only or also "evidence," how to handle the existence of competing transcripts and translations, and whether the voices on the tapes can be adequately identified. None of these issues has been directly referred to me. However, the issue of whether the tapes of conversations in a language other than English are alone "evidence" and the transcripts or translations thereof merely "aids" is a ques-

question is but one of a multitude of pre-trial issues presented to the presiding judge—my senior colleague, Judge T. Emmet Clarie—in one of the most protracted pre-trial criminal proceedings in United States history.

The vast majority of the taped conversations were conducted in Spanish, a language which the presiding judge does not, and the jury presumably will not, understand. Because I happen to be fluent in Spanish as well as English, Judge Clarie referred to me, with the consent of all parties, the determination of both the audibility challenges to these taped conversations, and the procedures by which to consider them.[5] Following extensive briefing, and oral argument on July 18, 1988, I issued an Order (filed July 20, 1988) describing the procedures I intended to follow for considering defendants' objections.[6]

I reviewed the challenged conversations during more than forty hours over a period of nine working days in late July and early August 1988. As a result of this extended and carefully documented review, I concluded that, of the 61 challenged conversations reviewed by me, 60 are admissible over the inaudibility objections; the objection to one conversation was sustained. My rulings on the audibility issue were entered in an Order (filed Aug. 18, 1988) ("Order"), attached hereto as Appendix B. That Order, standing alone, is a full and adequate response to the referral to me by Judge Clarie.

I file this memorandum on the relatively narrow question of audibility because of the unusual circumstances which brought it before me, and because deciding that issue here involved procedural questions of extraordinary detail and novelty, at least some of which are likely to arise again in other cases—most notably in cases involving electronic surveillance evidence in languages other than English. This memorandum serves a number of different purposes: to explain what I actually did in this unusual case; to explain how and why it is that the procedures I adopted far exceeded any requirements of law or sound judicial practice; and to derive from the available law and my own experience with this case some general principles and procedures that would ordinarily be applicable to a resolution of so-called "audibility" disputes. Part of the message for the future is "do as I say, not as I did."

## DISCUSSION

Let us first consider what the fact that the conversations are largely in Spanish does, and does not, imply.

█ First, the fact that the taped evidence is in a language other than English does not mean that a presiding judge (or a magistrate) who does not know that language is precluded from making the audibility determinations. In truly exceptional circumstances—such as those presented by a case of this size and duration—it may be economical, if feasible, to refer the audibility issue to a judicial officer who does know the language. However, the fact that the evidence is in a language unknown to the presiding judicial officer does not, and cannot, dictate *who* shall make the audibility determinations. As Judge Clarie has emphatically stated, "there is absolutely no requirement that claims of inaudibility be reviewed by a district court judge fluent in the language intercepted on the tape."[7] The extraordinary, if not unique, circumstances which led Judge Clarie to refer the audibility question to me—only weeks before the scheduled commencement of a long-delayed, multi-defendant trial—should

tion relevant to a determination of objections on the ground of inaudibility, and one on which I do express an opinion. *See infra* notes 9 and 10 and accompanying text.

5. *See* Order re Reference of Defendants' Claims of Inaudibility to the Honorable José A. Cabranes (filed June 21, 1988) ("Order re Reference"). The referral was made without objection by any party. *See* Certified Official Transcript of Tape Audibility Hearing of July 18, 1988 (filed July 25, 1988) ("Transcript") at 9.

6. *See* Ruling and Order Concerning Procedures for Considering Defendants' Objections to Electronic Surveillance Evidence on Grounds of Inaudibility (filed July 20, 1988) ("Ruling on Audibility Procedures").

7. Order re Reference at 2.

therefore be understood to have presented an opportunity, rather than a necessity, for someone other than the presiding judge to determine the audibility issue, and to do so, it has been hoped, in a simpler and more expeditious manner than was thought otherwise possible.[8]

Second, the fact that the tapes are in a language which presumably is also unknown to the jury raises a significant evidentiary question. Even where the tapes are in English, it is common to assist the jury in understanding them by providing "aids" in the form of transcripts. Such aids are commonly accompanied by instructions that the tapes are "the evidence" and that any conflict between the tapes and the transcripts must be resolved in favor of the former. *See, e.g., United States v. Koska,* 443 F.2d 1167, 1169 n. 1 (2d Cir.), *cert.*

*denied,* 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed. 2d 92 (1971). *See also, e.g.,* E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 15.28 (3d ed. 1977). Where the tapes are in a language other than English, however, such instructions have an air of the unreal, not to say the surreal. Transcripts in a language other than English will almost invariably be useless to the jury; the jury will need translations. And a jury cannot very well follow the tapes where they conflict with translations if the jury does not understand the language of tapes.[9] In such circumstances, it may make more sense to treat translations of transcripts of non-English-language conversations, as well as the tapes, as "evidence." *See, e.g., United States v. Rengifo,* 789 F.2d 975, 983 (1st Cir.1986); *United States v. Cruz,* 765 F.2d 1020, 1023–24 (11th Cir.1985).[10]

---

**8.** Referral of the audibility question to a judicial officer who knows the language of the tapes, but is not otherwise intimately involved in the case, will not ordinarily be more expeditious or desirable. When the tapes are in a language other than English and the jury must rely on translations, it would usually be preferable for the presiding judge to make the determination, notwithstanding that he or she does not know the language and based on the following, commonsense approach.

The first question would be whether there was enough audible sound on the tapes for accurate transcriptions and translations to be made therefrom. The determination of probativeness would be made by consulting such English translations as the parties (or a court-appointed expert) submit, supported by certificates or affidavits by the transcribers and translators as to their qualifications (and, perhaps, their methods of doing their work). To use the translations in this way would not place any imprimatur on one or the other of competing translations, so as to foreclose the submission of either to the jury and thereby usurp the jury's role in determining which of the translations is accurate. Nor would it preempt the role of the judge at trial to determine whether the translations are otherwise admissible under the Federal Rules of Evidence.

This approach may yet have some application in this case. The government has appealed Judge Clarie's decision to suppress 35 of the tapes which are also the subject of audibility challenges. Should those tapes be reintroduced to the case, it would be entirely appropriate for audibility challenges to them to be decided in this way. If this simple procedure were adopted, I assume that a judicial officer not familiar with Spanish could decide all of those

challenges in a matter of hours rather than days.

It may be that under the approach suggested the threshold for admissibility will be lower—and more will be left to the jury—than when the tapes are in English or when, as in this case, there happens to be a judicial officer available who knows the language of the tapes. There are, however, few alternatives. The solution used to date in this case—involving a close and careful review of each disputed conversation by a judicial officer familiar with the language— will not often be feasible, and to make this threshold determination a war of experts, only to be largely repeated for the jury at trial, seems wasteful. An alternative would be to eliminate the threshold determination altogether, recognizing that a judicial officer who does not know the language of the tapes cannot meaningfully apply the standard—with its element of probativeness, *see United States v. Arango–Correa,* 851 F.2d 54, 58–59 (2d Cir.1988)—that has been developed largely in English-language cases.

**9.** In most cases little or no purpose would be served by playing to a jury in a United States courtroom a tape of a conversation in a language other than English. It is arguable, however, that the particular circumstances of a case would make it material and relevant to play such a tape to a jury that does not understand the substance of the conversation, to show the mood or tone of the speakers, or the general context or ambiance of their conversation.

**10.** Judge Clarie, in another context and in what may arguably be understood as dictum, has referred to the transcripts as "aids" to the jury. *See* Ruling on Defendants' Objection to and Motion for Reconsideration of Paragraph Four of

■ A third question in making audibility determinations concerning tapes in a language other than English is whether the judicial officer should determine if the *jury* would find the tapes audible, or determine if a professional *transcriber* or *translator* would find them audible. Defendants insist that whether or not the jury is likely to *understand* the language of the tapes, the issue is the *audibility* of the tapes to the jury under the circumstances in which the jury would hear the tapes (if it heard them at all).[11] This proposition has a number of procedural corollaries to be discussed below. The government, on the other hand, argues that because the jury cannot understand the tapes, the court's task in determining audibility is to decide whether the conversations would be audible to a transcriber and/or translator, such that reliable transcriptions and translations could be made therefrom.[12] Unguided by any authority marshalled by the parties or uncovered by me, I have concluded that neither the defendants nor the government have properly described my role in these circumstances. A judicial officer making audibility determinations of evidence in a language other than English need not replicate either the listening conditions of the jury or the listening conditions of the transcribers and translators. To attempt to replicate the listening circumstances of a jury which will not be able to *understand*, and thus arguably need not even *hear*, the tapes in issue seems to be an exercise in metaphysics.

■ On the other hand, I conclude that I neither can nor should attempt to replicate the listening circumstances of the translators and transcribers. Without their experience, training, equipment, or time, a judicial officer *could not* do that. In any event, since I am fluent in Spanish, I took as my task to determine (under physical or mechanical circumstances not materially different from those under which a jury would listen) nothing more than whether the evidence meets the substantive test of admissibility in this Circuit: taped evidence is admissible "unless the unintelligible portions are so substantial as to render the [conversation] as a whole untrustworthy." *United States v. Bryant*, 480 F.2d 785, 790 (2d Cir.1973). Those conversations which meet this test are *a fortiorari* an adequate basis from which professional transcribers and translators could develop reliable transcripts or translations. It is in this pragmatic spirit that I have approached defendants' claims of inaudibility.

Pursuant to my order,[13] defendants have filed a list of audibility challenges, indicating conversation-by-conversation[14] which portions of the tapes and cassettes they contend are inadmissible.[15] By that document they have challenged the admissibility of 61 conversations on the 35 tapes which have not been suppressed on other grounds by Judge Clarie.[16] Also pursuant

Court's "Order: Relevant Tapes–Transcript/Translation Dispute Resolution Hearings" Dated August 11, 1987 (filed Oct. 2, 1987) at 6. At oral argument before me, the government indicated its intention to seek a clarification or reconsideration of that reference in light of the fact that the jury is presumed not to understand Spanish. *See* Transcript at 52–54.

**11.** *See, e.g.,* Defendants' Reply to Government's "Memorandum of Law in Support of Government's Proposed Order Regarding Audibility Dispute Resolutions Proceedings" (filed Jan. 20, 1988) ("Defendants' Reply Brief") at 3–4.

**12.** *See, e.g.,* Government's Posthearing Memorandum Regarding Audibility Dispute Resolution Procedures (filed July 20, 1988) ("Government's Posthearing Memorandum") at 8. This approach may be consistent with the one recommended herein for a judicial officer who does not know the language of the tapes. *See supra*

note 8. In view of the fact that I do know the language of the tapes, however, I have not here adopted the government's recommended approach.

**13.** *See* Order (filed July 1, 1988).

**14.** It was agreed at oral argument that a determination conversation-by-conversation, rather than tape-by-tape, was appropriate. *See* Transcript at 72–73.

**15.** *See* Defendants' Specification of Portions of Tape–Recorded Evidence Alleged to be Substantially Unintelligible (filed July 15, 1988).

**16.** Defendants have also challenged on audibility grounds the admissibility of 67 conversations contained on the 35 tapes or cassettes which have been suppressed by Judge Clarie. *See supra* note 4 and accompanying text.

to an order of the court,[17] the parties have filed under seal copies of their respective transcripts and translations of the challenged conversations. What use, if any, would be made of these transcripts and translations in determining audibility was left to my discretion.[18]

## A. Procedures

It is acknowledged by the government and defendants that the preferred procedure in this Circuit is for the judge to decide such objections as defendants have here raised out of the presence of the jury, and before trial.[19] *See, e.g., United States v. Bryant,* 480 F.2d at 789. At this point, however, the government and defendants part company.

At the outset of the proceedings before me, the following procedural questions emerged: (1) whether the court should listen to the original tapes, to the duplicate originals of those tapes, or to "real-time" copies of the duplicate original tapes; (2) whether the court may use expert assistance in making its determinations; (3) whether counsel must or should be present while the court listens to the tapes, and (4) the related question of what kind of record the court must make in anticipation of appeal; (5) whether the court may use the transcripts and translations filed by the parties, and if so, how; and (6) whether the court must listen to the tapes or cassettes on precisely the same equipment as will be used to play them to the jury.

The government and defendants have reached agreement on the first and second of these issues, and the court has adopted the course that they have recommended. Those issues and their resolutions are nevertheless also worthy of some comment.

### (1) *Which version of the tapes:*

Defendants have insisted that the court use the sealed original tapes, and not the duplicate original tapes (which were produced at the same time) or the "real-time" copies of the duplicate originals.[20] This position derives in part from defendants' general view that the court's task is an exercise in pure replication of the circumstances in which the jury will hear the evidence: because the jury will hear the original tapes, which are in defendants' view "the evidence," the judge must listen to the original tapes. The government, on the other hand, primarily for practical reasons, initially advocated using "real-time" copies.[21] At oral argument, the government explained that it had changed its position on this issue in order to put at least one issue to rest.[22]

■ I have used the original tapes because all parties have agreed on that course. My readiness to use the original tapes should not, however, be regarded as a statement that the use of such tapes is required as a matter of law or even as a matter of generally preferable judicial practice. Quite the contrary. In making audibility determinations, considerations of fairness, practicality, administrative convenience and judicial economy all militate in favor of the use of duplicates or copies, so long as an appropriate foundation is laid with respect to how they were made.

The most important practical consideration in determining which version of the tapes to use is that handling of the original tapes presents some danger to their integrity, although adequate precautions can be

17. *See* Recommended Ruling Regarding Interim Certification of Tapes to the Honorable José A. Cabranes (recommended by Magistrate F. Owen Eagan June 3, 1988 and approved by Judge Clarie June 21, 1988) ("Interim Certification") at 2.

18. *See id.* For discussion of the nature and use of the transcripts and translations in this case see *infra* notes 41–48 and accompanying text.

19. Whether the determination can or should be made outside the presence of counsel, as well as

outside the presence of the jury, is a different issue, hotly disputed in this case and discussed below.

20. *See, e.g.,* Defendants' Reply Brief at 3, 15.

21. *See* Memorandum of Law in Support of Government's Proposed Order Regarding Audibility Dispute Resolution Procedures (filed Jan. 12, 1988) ("Government's Memorandum") at 9.

22. *See* Transcript at 28.

and have been taken to protect them.[23] Another reason why the use of duplicates or copies would be preferable is that they can be physically marked with the beginning and end of each relevant conversation with less concern about their being damaged.[24] Such marking is both a great convenience to the listener and a guarantee that the judicial officer, the defendants, and the government are all referring to precisely the same portion of the tape. Another practical disadvantage of handling original evidence is that it requires—and in this case received—extensive documentation of the chain of custody, which handling of copies would not.

Of course one must also consider, against these practical advantages of using duplicates or copies, whether it would prejudice defendants for the court to listen to duplicate originals or real-time copies rather than the originals themselves. On that score there appears to be no consideration which would counteract the practical advantages of using duplicates or copies. The government has plausibly maintained, without contradiction by defendants, that if any difference in quality exists, the duplicate originals or real-time copies are of lesser clarity, so that any such difference would redound to the benefit of defendants' argument of inaudibility.[25]

▉ Thus while I have adopted the course recommended to me by all the parties to this case, I have done so as a discretionary matter. At least when the proponent of the tape is willing to have the audibility determinations made from duplicates or copies of lesser quality, and when there are no serious questions of the accuracy of the copies or duplicates, the court should be free to listen on duplicates or copies, notwithstanding that they are not the tapes to which the jury will listen at trial.

### (2) The use of expert assistance

Defendants have argued that for the court to use expert assistance in determining audibility would be an improper delegation of a judicial function.[26] At the outset the government disagreed, but on this issue also changed its position, explaining at oral argument that this change was occasioned by the fact that a judicial officer who knew Spanish, rather than a judicial officer who did not know Spanish, would be making the determinations.[27]

Since it was in any event my inclination to proceed without such assistance, this is the course I have followed. However, the decision not to use a court-appointed expert in the Spanish language does not represent a conclusion of law that the use of such assistance would be an improper delegation, either for a judicial officer who knew the language of the tapes or for one who did not. Where the judicial officer making an audibility determination does not know the language of the recorded conversations, it may (or may not) be useful for that officer to appoint an expert in the lan-

---

**23.** Notwithstanding these precautions, accidents will happen. For example, one tape broke during the audibility determinations and could not be spliced without removing a section of several inches. That accident seemed to raise concretely the question whether the court could make the determination using a duplicate or real-time copy. As it happened, the damaged section was not part of a conversation which the government intended to use in its case-in-chief, and I could therefore use the original to make the audibility determination after the damaged section had been removed and the tape spliced. I assume, however, that if the damaged section had been part of a relevant conversation, it would have been entirely acceptable for me to make the audibility determination on a duplicate or real-time copy.

**24.** I regret that I did not thoroughly explore the possibility of physically marking the original tapes. Absent some adequate explanation to the contrary, such marking should be acceptable practice. The lack of physical designations of the beginning and end of conversations made me dependent on meter or counter numbers as a way of finding relevant conversations. Such numbering systems are only approximate, however, and their usefulness varies with how each user (even of the same machine) handles the tapes. The counter numbers are therefore a poor practical substitute for physical marking.

**25.** See Government's Memorandum at 10.

**26.** See Objection to Government Proposal Concerning Audibility of Tapes (filed July 30, 1987) at 2–3.

**27.** See Transcript at 16.

guage. A rule which precludes the judicial officer from exercising his or her discretion in such circumstances serves no discernible interest of fairness or justice.

### (3) *The presence of counsel while the court listens*

Defendants have been in possession of the tapes since the spring of 1986.[28] They have had the time—as well they should—to make a careful specification, conversation-by-conversation, of which parts of the tapes they considered inadmissible. They have also had the opportunity to brief extensively, and to argue, the procedures and substantive standard which should be used in considering their contentions of inadmissibility.

Defendants nevertheless have consistently sought to be present while the court listened to the tapes,[29] characterizing any other approach as decision-making in the "back room."[30] Inasmuch as the tapes are filed under seal, defendants envisage the attendance of counsel at all listening sessions, but the exclusion of the public and the press.[31] The government maintains that the court is at liberty to listen and determine admissibility at its convenience in chambers out of the presence of counsel as well as the jury, but has left the door open to an occasional hearing concerning particular tapes upon a showing of a specific need, supported by proper authority.[32]

 I have concluded that, as a general rule—sanctioned by well-established judicial practice grounded in considerations of judicial economy and by the absence of compelling or persuasive arguments to the contrary—a judicial officer has the discretion to decide whether to listen to tapes in the presence of counsel (in chambers or otherwise) or to listen to tapes in chambers out of the presence of counsel. In the particular circumstances presented, and for the reasons more fully explained below, I chose to do the latter.

Defendants have cited no authority for the proposition that they have a right to be represented while the court listens to the tapes. The government, on the other hand, reads two decisions of our Court of Appeals to authorize the court to listen to the tapes outside of the presence of counsel. One of these is *United States v. Bryant,* 480 F.2d 785 (2d Cir.1973). The procedural issue on appeal in *Bryant,* however, was the failure of the judge to follow "correct procedure," which would have been to listen to the tape and rule on objections before playing the tape to the jury. *See id.* at 789. The Court of Appeals appears not to have had before it the question of whether listening to the tapes outside the presence of *counsel,* as opposed to outside the presence of the *jury,* was also correct procedure.

The other case relied upon by the government is *United States v. Chiarizio,* 525 F.2d 289 (2d Cir.1975). The government focuses on the following language: "before either tapes or transcripts are submitted to the jury, the judge should listen to the tapes and examine the transcripts *in camera,* receiving both sides' objections to the proposed evidence." *Id.* at 293. The government emphasizes the phrase *"in camera."* However, to read the phrase as meaning "out of the presence of counsel," as well as "out of the presence of the jury," seems unwarranted. First, the court in *Chiarizio* is relying on *Bryant,* and probably merely paraphrasing "out of the presence of the jury" by using the phrase *"in camera."* Such a paraphrase would be consistent with the dictionary meaning of *"in camera,"* which refers to the exclusion of spectators, *see Black's Law Dictionary* 684 (5th ed. 1979), but is consistent with the presence of counsel such that a "hear-

---

**28.** *See* Government's Memorandum at 6.

**29.** *See, e.g.,* Defendants' Post–Hearing Memorandum and Proposed Order Respecting Determination of Audibility of Specified Tape Recordings (filed July 20, 1988) ("Defendants' Posthearing Memorandum") at 1–3; Transcript, *passim.*

**30.** Transcript at 58.

**31.** *See id.* at 89.

**32.** *See* Government's Memorandum at 13.

ing *in camera*" is not a contradiction in terms. This seems to be the meaning in *Chiarizio*, where the phrase *"in camera"* is immediately succeeded by the phrase "receiving both sides' objections," which suggests the presence of counsel. Presumably adverting to the appellate court's discussion of the trial court's failure to "listen to the tapes ... so as to compare the contents of the tapes with the contents of the transcripts," 525 F.2d at 293, the government claims this means that the trial court is advised to receive objections to tapes in writing, in the form of transcripts.[33] That reading too seems strained and unwarranted. The issue on appeal in *Chiarizio* was the admissibility of a government-prepared *transcript* of a tape, which was given to the jury without the judge's prior comparison of it to the tape. The comparison of tape to transcript would have been for the purpose of evaluating the use of the *transcript*, not the use of the tape. Thus the function of the transcript cannot have been merely to serve as a vehicle for making objections to the tape.

There are, to be sure, some opinions which reveal that the judge did in fact consider challenges to the admissibility of tapes and/or transcripts in the presence of counsel. *See, e.g., United States v. Lawson*, 347 F.Supp. 144, 148 (E.D.Pa.1972); *Gorin v. United States*, 313 F.2d 641, 651–52 (1st Cir.), *cert. denied*, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963). However, no cases have been drawn to my attention, and I have found none, in which it is held that the presence of counsel during either the listening to tapes or the comparison of transcripts to tapes for accuracy is necessary to a fair adjudication of evidentiary challenges.

In the absence of authority supporting the position of defendants, I have considered defendants' stated reasons for hav-

ing counsel present while I listened to the tapes. These fall into the following categories: (1) to expedite the determinations by calling to the court's attention which specific portions of any given conversation are considered inaudible; (2) to argue that the inaudibility of one or more portion of a conversation renders the audible portions misleading or untrustworthy; and (3) to observe and record how many times the court listens to a conversation, so as to be able to argue on appeal that its admission was an abuse of discretion.

■ The first argument, on grounds of efficiency, is clearly an appeal to prudential considerations, and not an appeal to legal authority. That argument may well sometimes be persuasive. In the circumstances presented to me, however, I find that it is not. In this case there are many defendants, making many audibility challenges, some of which are to quite lengthy conversations. It could be anticipated that the determinations might have to be made over the course of weeks rather than hours.[34] As it happens, in part because of the procedural and substantive contentions of the defendants, the task of reviewing this evidence extended over a period of nine working days devoted almost exclusively to these issues of audibility, during which at least one tape or another was logged out to me for a total of some 47 hours.[35] The government plausibly represented that to follow defendants' proposed procedure—allowing interruptions for argument as the tapes were played—might extend the process over "many months."[36] It would certainly have at least doubled the listening time. Under those circumstances, I concluded that the administrative problems of scheduling and conducting formal hearings, and the distractions of having many other persons present during a process which

33. *See* Transcript at 71.

34. At oral argument, defendants estimated that the challenged conversations would take twenty hours of straight playing time alone, without accounting for time consumed in locating relevant conversations, or replaying, or argument. *See id.* at 87. In Defendants' Post–Hearing Memorandum at 2, defendants revised their esti-

mate downward to five hours, apparently using the same method.

35. *See* Certificate of Deputy Clerk Dennis Wysocki (filed Aug. 12, 1988) and the accompanying official log maintained by the Deputy Clerk.

36. Transcript at 83.

required considerable concentration, outweighed whatever arguable benefit in the form of efficiency might have derived from the presence of counsel.

Nor am I persuaded by the second argument—that counsel should be present to argue that the inaudibility of one portion of a conversation renders the audible portion inadmissible as well. At oral argument, defendants were asked what more they could do, if they were present, than reiterate in relation to each particular challenged conversation that it failed the general test of admissibility. The only answer was that defendants might, for example, be able to argue as to a particular ten-minute conversation that nine minutes of it was inaudible and thus rendered the remaining, audible portion inadmissible.[37] But there is no bright-line *quantitative* rule as to the acceptable balance between audible and inaudible portions. Therefore, counsel could do no more of a substantive nature in person than defendants have already done in writing by indicating, conversation-by-conversation, which conversations they contend are inadmissible. Furthermore, as the government has said, it would make little sense to have the parties arguing to me that I hear what I think I do not hear, or that I do not hear what I think I do. The court must determine for itself what it hears. Under the circumstances, the presence of counsel to make such arguments as they have suggested making would only unnecessarily prolong the audibility determinations.

The third argument—that defendants must be present to observe and record how many times the court listens to a conversation in the course of making its determination—fares no better. Defendants rely exclusively on the case of *People v. O'Keefe*, 280 App.Div. 546, 115 N.Y.S.2d 740, 744 (3d Dept.1952), for the substantive proposition that the number of listenings is relevant to admissibility, and for the procedural corollary that defendants must be present to count (or at least that the record must reflect) the number of listenings, so that the issue can be raised on appeal.[38] This decision is neither binding nor persuasive authority for the proposition defendants assert.

First, the case does not appear to stand for this proposition. The issue on appeal in *O'Keefe*, insofar as it involved tape-recorded evidence at all, was not the audibility of the tapes. The issue on appeal, rather, was the submission to the jury of an unauthenticated typewritten interpretation of stenographic notes of the tapes, and of the replayings of the tapes at trial. The appellate court did observe that the tapes sometimes required replaying before they were intelligible. No issue is made of the number of replayings, however, except to say that under the circumstances the jury was likely in fact to have relied upon the unauthenticated transcripts.

Second, even if the case did stand for the proposition that the number of replayings is a material issue in a trial court decision or in an appeal of an audibility determination, it would not be persuasive. Defendants concede that there is no bright-line rule regarding the number of playings which would raise fatal suspicions on appeal.[39] Such a rule, whether bright-line or approximate, would not be reliable in view of the multitude of reasons there might be for listening to the same conversation more than once—for example, a concern to be especially careful in making the determinations, or the desire to consider the question of probativeness apart from the question of literal audibility, or that the court was interrupted or distracted during one listening. The meticulousness or difficulty with which an audibility decision is made should no more throw the end result into question than would the meticulousness or difficulty involved in reaching any other kind of decision. I conclude that the number of replay-

37. *See id.* at 67.

38. *See* Memorandum Submitted by Defendants Hilton Fernandez Diamante and Ivonne Melendez Carrion with Respect to Judicial Proceedings for Determining the Audibility of the Government's Tape–Recorded Evidence (filed Jan. 6, 1988) ("Fernandez Memorandum") at 5 n. 1.

39. *See* Defendants' Reply Brief at 20.

ings required or desired by the judicial officer in making audibility determinations is not a matter which could or should by itself be decisive in a trial court decision or in an appeal of that decision, and the presence of counsel while that officer is listening is therefore not necessary on this account. *Cf. United States v. Lawson,* 347 F.Supp. at 148–49 (permitting the jury to hear, over defendant's objection, a reading of transcripts prepared by an agent who "listened to some of the tapes a dozen or more times before reaching his final conclusion as to the content of the conversations" upon a finding by the court that "the transcripts were an accurate depiction of the contents of the tape recordings").

Where, as here, defendants have had, and do not deny they have had, an abundant opportunity to register their objections in writing, and have had the opportunity to call to the court's attention such reasons as there are for their presence, the judicial officer should be at liberty to determine whether counsel shall be present or not. Even if the audibility decision is characterized as a finding of fact (as defendants argue), it is the sort of decision—requiring the taking of no other evidence and no cross-examination—which can be fairly and intelligently made by the judicial officer in chambers and out of the presence of counsel, upon written indication by the opponent of the evidence of which portions are alleged to be inadmissible. This approach is no more suspect as "back room" decision-making than is deciding motions on the papers, or reviewing in private documents which are claimed to be the subject of privilege, for which history and long-established practice provide ample support.

### (4) *The nature of the record for review on appeal*

At oral argument I raised the question of the kind of record which should be kept for appellate review. I proposed to use a form on which to register the substantive determinations, conversation-by-conversation, a

version of which form I in fact used and is attached hereto as Appendix A. Because one major procedural question (discussed below at (5)) was whether the court might use transcripts and translations in making the audibility determinations, I noted on the form those tapes for which I consulted the transcripts and translations. For the reasons discussed above, I declined defendants' request to record the number of times I listened to each tape, although I did indicate the date or dates on which I considered each tape.

■ I also declined defendants' suggestion that the form reflect which portions of each conversation were audible and which were not. Such a detailed determination— virtually word-by-word—is in no way required by the agreed-upon substantive standard of admissibility: to wit, that the conversation be admitted "unless the unintelligible portions are so substantial as to render the [conversation] as a whole untrustworthy." *United States v. Bryant,* 480 F.2d at 790. Reiterating this standard, our Court of Appeals has recently explained that a district court should focus on "the probative nature of the tapes, and not merely their audibility." *United States v. Arango–Correa,* 851 F.2d 54, 58–59 (2d Cir.1988). This sort of qualitative rather than quantitative determination does not require such a fine-grained record of what the judicial officer heard and did not hear. Defendants, in the context of opposing the use of transcripts and translations in making the audibility determinations, have argued as much.[40]

For similar reasons, I also did not indicate—as defendants requested—which portions of transcripts or translations were examined.

### (5) *The use of transcripts and translations*

The government has filed under seal both transcriptions and translations for all

---

**40.** *See* Transcript at 37 ("The test ... is whether the conversation as a whole is substantially unintelligible. If it was a matter of disagreement with a particular phrase at a particular point in

the tape ..., I would understand trying to ... narrow the focus to that particular point. That's not the nature of our claims.").

of the conversations to which defendants object on grounds of inaudibility. Defendants have filed under seal translations, or both transcriptions and translations, for all but one of these conversations. It is anticipated that at least some of these documents, which indicate both what is thought to have been said and where the conversations are thought to be inaudible, will be offered as "aids to the jury" at trial.[41] Defendants strenuously contend that there is no proper role for transcripts or translations in the audibility determinations.

Defendants' argument, unsupported by authority, is twofold. First, they argue that any transcripts and translations are unduly suggestive that there *is* something audible on the tapes, when that is precisely what the court is to determine.[42] Second, they argue that their own transcripts and translations are irrelevant to the audibility determination because they were prepared for a different purpose—that is, as aids to the jury's understanding of the tapes if they are admitted at trial, and not for the purpose of specifying the nature of their claims of inaudibility.[43]

The government takes the position that the use of transcripts and/or translations in making the audibility determinations is entirely appropriate, and indeed the "rec-

ommended" procedure.[44] The government finds support for its position in several cases: *United States v. Frazier*, 479 F.2d 983, 985 (2d Cir.1973); *United States v. Slade*, 627 F.2d 293, 302 (D.C.Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); *United States v. Chiarizio*, 525 F.2d 289, 293 (2d Cir.1975). *Frazier* and *Slade*, each in its way, intimate that the court may consider transcripts in deciding whether to allow the jury to hear taped evidence. There is a similar intimation in *United States v. Lawson*, 347 F.Supp. at 148–49, and in *United States v. Arango-Correa*, 851 F.2d at 58–59 (2d Cir.1988). But no case cited by the parties or uncovered by this court seems to dispose of the question.

Because this appeared to be a novel question, and in order to have the record clear, I listened to all but two of the conversations once, without reference to the transcripts and translations submitted by the parties.[45] As a general matter, upon that first listening I determined which conversations were admissible and which were not without aid of transcripts or translations, making no substantive use of transcripts and translations in relation to conversations which were admissible without them.[46] I then listened again to conversa-

---

**41.** *See supra* note 10 and accompanying text.

**42.** *See, e.g.,* Defendants' Post–Hearing Memorandum at 3–4; Fernandez Memorandum at 3, 6.

**43.** *See* Transcript at 35–37. Defendants also argue that because they have Spanish transcripts of only 14 of the 35 tapes under consideration, it would be unfair for me to consult the transcripts. *See* Defendants' Post–Hearing Memorandum at 3–5. Defendants have, however, submitted translations of all but one of the conversations for which they have not prepared Spanish transcripts. These defense translations, which may serve a different function from transcripts under other circumstances, do serve one function similar to transcripts in the audibility context, in view of the fact that they indicate where the tape is thought to be inaudible or unintelligible.

**44.** *See* Government's Supplemental Memorandum Regarding Audibility Dispute Resolution Proceedings (filed June 29, 1988) ("Government's Supplemental Memorandum") at 7.

**45.** On two occasions I inadvertently departed from my general method of operation and had before me the transcripts and/or translations as I listened the first, and only, time.

**46.** As to conversations found admissible without use of transcripts, I located the challenged conversations in the first instance by use of the meter numbers provided by the government both to defendants and to me. Because, however, that system is at best approximate, I subsequently returned to these conversations, using the transcripts and translations to be certain that I had in fact listened to the portions of the tapes the government intended to use and the defendants challenged. Such a corroborative use of the transcripts and translations can hardly be objectionable.

Where this corroborative use was the only one I made of transcripts or translations, and no transcripts or translations were involved in the substantive determination of audibility, I have not indicated on the form registering my substantive decisions, which is attached hereto as Appendix A, that I consulted *any* transcripts or

tions which I had found substantially inaudible at first, this time consulting the transcripts and translations from both sides, with the exception of one tape for which defendants supplied neither a transcript nor a translation. I then determined which of these were admissible with the aid of transcripts or translations, and which were not audible even *with* the aid of transcripts and translations.[47]

A word is necessary concerning the nature of my use of the transcripts and translations. In my Ruling on Audibility Procedures, I indicated that "[i]f after experimentation I find that [the transcripts and translations] assist me in making the audibility determinations, I will use them as a guide to defendants' specific claims of inaudibility and as an indication of where the government in fact disputes those claims." In practice, this was an unwieldy and ineffective way of focusing the dispute, especially because in some cases a government transcript had to be compared to a defense translation. As it emerged, for those conversations which I found substantially inaudible on first listening, I used transcripts and translations as a jury might use them at trial: as an aid to understanding, but remembering always that where my hearing of the conversations differed from the representation of them in the transcripts or translations, my hearing of them (or my inability to hear them) must prevail.[48]

■ I am convinced, however, that this elaborate approach was not necessary. The business of a judicial officer in making audibility determinations is to discover whether the proffered evidence is sufficiently trustworthy and probative, notwithstanding partial inaudibility, to go to the jury. Where evidence which is potentially intelligible and probative can be made actually intelligible by transcripts and/or translations, there is no persuasive reason for the judicial officer making audibility determinations to ignore the means by which this can be effected. While the situation is not precisely analogous, the approval of our Court of Appeals for enhancement of tapes which are otherwise inaudible illustrates this general proposition. *See United States v. Knohl*, 379 F.2d 427, 440 (2d Cir.), *cert. denied*, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). If, as here, there is a dispute about which of the transcripts and/or translations is accurate, it is for the jury to decide which of the transcriptions and translations—if either—to credit.

#### (6) *Which equipment*

The government proposed that the court listen to the tapes on a Revox B–77 player/recorder and to the cassettes on a Superscope–C–202 LP cassette player/recorder, both with the recording function disabled. The government again put forward a prac-

---

translations, or that I listened to these tapes more than once.

This fact will explain most—though not all—of the occasions on which there is a discrepancy between the dates on the form incorporated into this opinion and the dates on the log which was kept by Deputy Clerk Dennis Wysocki to document the chain of custody as he removed tapes from the secured place in which they were kept for delivery to me. *See* Certificate of Deputy Clerk Dennis Wysocki (filed Aug. 12, 1988) and the official log attached thereto. There are a few other occasions when the log shows that tapes were delivered to me, but my form shows no corresponding entry. On these occasions, for one reason or another I did not listen to all of the tapes that were delivered to me that day.

**47.** In finding one conversation inadmissible even after consulting the transcripts and translations, I am not expressing the view that the transcripts and translations were in any way inaccurate or improperly developed. With su-

perior experience and training, more time, and, perhaps, better equipment, expert transcribers and translators may well have heard what I was unable to hear—even with their assistance.

**48.** Neither this use of the transcripts and translations, nor my specific conclusions that certain conversations were admissible only when I consulted transcripts and translations, constitutes a finding as to which, if either, of the transcripts or translations is accurate.

The use of transcripts and translations as aids to understanding is the use for which defendants say their transcripts and translations were prepared. My using them as such, rather than as briefs or arguments on audibility as originally proposed, should thus satisfy defendants' second objection to my consulting these documents. *See supra* note 43 and accompanying text. The first objection is discussed in the text below.

tical reason for this choice: for both of these machines there existed a counter number system by which particular points in each tape or cassette could be located with relative dispatch.[49] These number systems had been used to identify the conversations which the government intended to use and to identify the conversations to which defendants objected. Absent physical marking of the tapes, a counter number system is the only convenient—though still imperfect—means of locating relevant conversations on the tapes.[50]

Defendants have no particular objection to this equipment.[51] Rather, they oppose the use of any equipment unless it is the same as would be used at trial, again arguing that the court must replicate the circumstances under which the jury would listen.[52] They argue that determinations made under conditions that "differ in a material way from what the jury will have . . . will have no meaning." [53]

■ I conclude that at least under the circumstances presented there is no necessity for the judicial officer to listen on the same machines as the government would use at trial. At the time I was prepared to make the audibility determinations, the government had not yet determined which equipment to use at trial. It was trying to determine which equipment would both provide quality sound reproduction and be adaptable to the use of multiple headphones, as well as perhaps avoid the problem of having a tangle of cords in the courtroom.[54] The government represented that it was seeking the best quality sound reproduction possible and would use the same

equipment as had been provided to me if it was adaptable to the courtroom setting.[55] Furthermore, as the government pointed out, its incentives are to make available in the courtroom equipment of at least comparable quality in sound reproduction.[56] Finally, there is nothing in the record to suggest that the quality of the equipment proposed by the government for use by me differs materially from other possible equipment which might be used at trial.

The most compelling reason to use equipment recommended by the government is that no other machine would be compatible with the counter number system. Defendants concede that the availability of a counter number system would save considerable time deciding their claims.[57] Allowing for the possibility that the conclusion might be different where the tapes were in English, to sacrifice the sole practical means of moving through the tapes with dispatch to the mere *possibility* of a difference in quality of the sound to be heard by a jury—a jury which presumably will not, in any event, understand it—seems entirely unwarranted.

■ In sum, our Court of Appeals has stated that the preferred procedure for determining audibility challenges is for the judicial officer to listen to the taped evidence and rule on objections to it before it is played to the jury. That preferred procedure obviously implies that the opponents of taped evidence should be given the opportunity—and responsibility—to register specific objections to the evidence before the jury hears it. The preferred procedure has been fully observed in this case, and no

---

**49.** By the Interim Certification to me of the audibility issue, the government was ordered to produce a Sony BM–75 cassette player/recorder. It was subsequently determined that the only meter number system for using the cassettes had been developed on the Superscope. The Superscope was therefore substituted for the Sony, with no objection by any party.

**50.** The problem of making sure that I was listening to the relevant portions of the tapes could also have been solved by having the government (and defendants) present to locate them. For reasons discussed elsewhere in this opinion, this convenience was outweighed by other considerations. *See supra,* this opinion at section A(3).

**51.** *See* Transcript at 27–28; *supra* note 49 and accompanying text.

**52.** *See, e.g.,* Transcript at 18.

**53.** *Id.* at 20.

**54.** *See id.* at 19–20.

**55.** *See id.*

**56.** *See id.*

**57.** *See id.* at 26.

more is required. Beyond this, the procedures used in making audibility determinations are—like the substance of those determinations—left to the sound discretion of the judicial officer who makes the determinations. Whether taped evidence in a language other than English is reviewed by a judicial officer who knows that language, whether the objections are registered in writing or by counsel during the listening process, whether the judicial officer uses expert assistance in making the determinations, whether the judicial officer consults transcripts and/or translations while listening, and whether that officer listens to precisely the same version of the tapes on precisely the same equipment as will be used at trial are all issues well within that area of discretion.

With the procedural issues thus laboriously resolved, I turn finally to the substance of the audibility determinations.

#### B. Admissibility

Defendants and the government agree that the standard by which this evidence should be judged is provided by our Court of Appeals in *United States v. Bryant*, 480 F.2d 785 (2d Cir.1973). The Court has recently reiterated the rule of *Bryant* that " 'unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy, the recording is admissible ...' " *United States v. Arango-Correa*, 851 F.2d at 58 (quoting *Bryant*, 480 F.2d at 790). It went on to observe that its "decisions in this area reveal a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative." *Id.* I take this to be the sort of determination which would be made concerning a blurred photograph. A decision to admit such a photograph into evidence would not be a finding or prediction that the jury *will* find the photograph probative, much less that the jury will find it probative of that which its proponent intends to prove by it. Rather, it would be a threshold judgment that the photograph is sufficiently clear that the jury may learn something relevant from it, rather than being forced merely to spec-

ulate about what it contains. If there are ambiguities, it remains for the parties to persuade the jury of what the evidence contains or means and for the jury to decide what weight to give it.

The form attached hereto as Appendix A registers which of the conversations the government proposes to use in its case-in-chief are admissible, and which are not, by this standard. It also contains a great deal of detailed information which, while it may have been useful or interesting in this case, was not in any sense required by law. The prolonged controversy about subsidiary matters here, and the colloquy with counsel at oral argument preceding my examination of the evidence, prompted me to provide in this case a more detailed account than is necessary or (in most cases) appropriate. In other circumstances, neither law nor sound judicial practice would require or suggest that a judicial officer go this far. No more was or should be necessary than a summary statement of determinations of admissibility, such as the one attached hereto as Appendix B. In any event, the form at Appendix A indicates:

(1) those conversations which are admissible, and were determined to be so without the aid of transcripts and translations;

(2) those conversations which are admissible, and were determined to be so when they were accompanied by transcripts and translations, and

(3) those conversations which remained substantially inaudible, and hence inadmissible, notwithstanding the availability of transcripts and translations.

#### CONCLUSION

Based on a consideration of the record of this case, all of defendants' objections on grounds of inaudibility, insofar as they relate to tapes which have not been suppressed by Judge Clarie, are overruled, with the exception of the objection to the conversation designated as Vega Baja 157, as to which the objection is sustained.

It is so ordered.

# APPENDIX A

SOURCE *DATSUN SENTRA*

| REEL # CONVERSATION #<br>[Counter Numbers] | REVIEWED<br>BY COURT<br>(date) | TRANSLATIONS OR<br>TRANSCRIPTS CON-<br>SULTED<br>(Yes/No) | | CONVERSATION<br>ADMISSIBLE INADMISSIBLE | |
|---|---|---|---|---|---|
| | | Gov. | Def. | | |
| 3 (1st Conv.) [046/168] | 7/27/88 a | No | No | X | |
| 3 (2d Conv.) [256/294] | 7/27/88 a | No | No | X | |
| 9 (1st Conv.) [616/668] | 7/27/88 a | No | No | X | |
| 9 (2d Conv.) [001/126] | 7/27/88 a | No | No | X | |
| 21 (1st Conv.) [001/025] | 7/27/88 a | No | No | X | |
| 21 (2d Conv.) [095/106] | 7/27/88 a | No | No | X | |
| 27 (1st Conv.) [054/084] | 7/27/88 a | No | No | X | |
| 27 (2d Conv.) [114/169] | 7/27/88 a | No | No | X | |
| | 7/27/88 | No | No | | |
| 27 (3d Conv.) [214/218] | 7/28/88 | Yes | Yes | X | |
| 27 (4th Conv.) [373/414] | 7/27/88 a | No | No | X | |
| 27 (5th Conv.) [434/450] | 7/27/88 a | No | No | X | |
| | 7/27/88 | No | No | | |
| 30 [001/149] | 7/28/88 | Yes | Yes | X | |
| 33 (1st Conv.) [256/263] | 7/28/88 a | No | No | X | |
| 33 (2d Conv.) [332/355] | 7/28/88 a | No | No | X | |
| 33 (3d Conv.) [357/366] | 7/28/88 a | No | No | X | |
| 33 (4th Conv.) [036/078] | 7/28/88 a | No | No | X | |
| 33 (5th Conv.) [113/273] | 7/28/88 a | No | No | X | |
| 35 [054/082] | 7/28/88 a | No | No | X | |

a. *See supra* note 46.

SOURCE *VEGA BAJA RESIDENCE*

| REEL # CONVERSATION #<br>[Counter Numbers] | REVIEWED<br>BY COURT<br>(date) | TRANSLATIONS OR<br>TRANSCRIPTS CON-<br>SULTED<br>(Yes/No) | | CONVERSATION<br>ADMISSIBLE INADMISSIBLE | |
|---|---|---|---|---|---|
| | | Gov. | Def. | | |
| 40 [1399/1655] | 7/21, 22/88 b | No | No | X | |
| 45 [1087/1481] | 7/22/88 c | Yes | Yes | X | |
| 46 (1st Conv.) [170/215] | 7/22/88 b | No | No | X | |
| 46 (2d Conv.) [279/828] | 7/22/88 b | No | No | X | |
| 51 [412/483] | 7/22/88 b | No | No | X | |
| 54 [1061/1072] | 7/22/88 b | No | No | X | |

| REEL # CONVERSATION # [Counter Numbers] | REVIEWED BY COURT (date) | TRANSLATIONS OR TRANSCRIPTS CON-SULTED (Yes/No) | | CONVERSATION | |
|---|---|---|---|---|---|
| | | Gov. | Def. | ADMISSIBLE | INADMISSIBLE |
| | 7/22/88 | No | No | | |
| 59 [1064/1670] | 7/28/88 | Yes | Yes | X | |
| | 7/22/88 | No | No | | |
| 63 (1st Conv.) [501/547] | 8/3/88 | Yes | Yes | X | |
| | 7/22,25/88 | No | No | | |
| 63 (2d Conv.) [862/1262] | 8/3/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 67 (1st Conv.) [1084/1106] | 7/28/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 67 (2d Conv.) [1204/1217] | 7/28/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 67 (3d Conv.) [1594/1663] | 7/28/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 80 [506/986] | 7/29/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 86 [1455/1680] | 7/29/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 89 (1st Conv.) [676/709] | 7/29/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 89 (4th Conv.) [1087/1115] | 7/29/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 97 (2d Conv.) [777/836] | 7/29/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 97 (3d Conv.) [964/1089] | 7/29/88 | Yes | Yes | X | |
| | 7/25/88 | No | No | | |
| 97 (4th Conv.) [1119/1341] | 7/29/88 | Yes | Yes | X | |
| 97 (5th Conv.) [1367/1794] | 7/25/88 b | No | No | X | |
| | 7/26/88 | No | No | | |
| 101 (1st Conv.) [218/773] | 7/29/88 | Yes | Yes | X | |
| | 7/26/88 | No | No | | |
| 101 (2d Conv.) [894/963] | 7/29/88 | Yes | Yes | X | |
| | 7/26/88 | No | No | | |
| 101 (3d Conv.) [1562/1572] | 7/29/88 | Yes | Yes | X | |
| | 7/26/88 | No | No | | |
| 101 (4th Conv.) [1671/1748] | 7/29/88 | Yes | Yes | X | |
| | 7/26/88 | No | No | | |
| 104 [959/972] | 7/29/88 | Yes | Yes | X | |
| | 7/26/88 | No | No | | |
| 114 (1st Conv.) [755/1140] | 8/2/88 | Yes | Yes | X | |
| | 7/26/88 | No | No | | |
| 114 (2d Conv.) [1284/1311] | 8/2/88 | Yes | Yes | X | |
| | 7/26/88 | No | No | | |
| 114 (3d Conv.) [1455/1471] | 8/2/88 | Yes | Yes | X | |

| REEL # CONVERSATION # [Counter Numbers] | REVIEWED BY COURT (date) | TRANSLATIONS OR TRANSCRIPTS CONSULTED (Yes/No) | | CONVERSATION | |
|---|---|---|---|---|---|
| | | Gov. | Def. | ADMISSIBLE | INADMISSIBLE |
| 114 (4th Conv.) [1600/1609] | 7/26/88 | No | No | | |
| | 8/2/88 | Yes | Yes | X | |
| 118 [1077/1232] | 7/26/88 | No | No | | |
| | 8/2/88 | Yes | Yes | X | |
| 119 [334/429] | 7/26/88 | No | No | | |
| | 8/2/88 | Yes | Yes | X | |
| 151 (1st Conv.) [004/576] | 7/26/88 | No | No | | |
| | 8/2/88 | Yes | Yes | X | |
| 151 (2d Conv.) [665/679] | 7/26/88 | No | No | | |
| | 8/2/88 | Yes | Yes | X | |
| 157 [544/1385] | 7/26/88 | No | No | | |
| | 8/2, 3/88 | Yes | Yes | | X |
| 161 [984/1021] | 7/26/88 | No | No | | |
| | 8/2/88 | Yes | Yes | X | |
| 164 [352/539] | 7/26/88 | No | No | | |
| | 8/2/88 | Yes | Yes | X | |
| 180 [472/580] | 7/26/88 | No | No | | |
| | 8/2/88 | Yes | N.A. d | X | |
| 203 [293/751] | 7/27/88 | No | No | | |
| | 8/2, 3/88 | Yes | Yes | X | |
| 226 [298/415] | 7/27/88 | No | No | | |
| | 8/2/88 | Yes | Yes | X | |
| 234 (2d Conv.) [342/494] | 7/27/88 | No | No | | |
| | 8/2, 3/88 | Yes | Yes | X | |

b. *See supra* note 46.

c. *See supra* note 45.

d. Not available.

SOURCE EL CENTRO CONDOMINIUM

| REEL # CONVERSATION # [Counter Numbers] | REVIEWED BY COURT (date) | TRANSLATIONS OR TRANSCRIPTS CONSULTED (Yes/No) | | CONVERSATION | |
|---|---|---|---|---|---|
| | | Gov. | Def. | ADMISSIBLE | INADMISSIBLE |
| 6 (1st Conv.) [133/307] | 8/2/88 f | Yes | Yes | X | |
| 15 [1128/1171] | 7/27/88 e | No | No | X | |
| 32 (1st Conv.) [293/404] | 7/27/88 e | No | No | X | |

e. *See supra* note 46.

f. *See supra* note 45.

---

## APPENDIX B

### ORDER

I have listened to the conversations to which defendants object on grounds of inaudibility over a period of nine working days devoted substantially to this task, considering their admissibility against the standard of this Circuit. *See United States v. Arango–Correa,* [851 F.2d 54, 58–59] Docket Nos. 87–1522, –1523, slip op. 4467, 4475–76 (2d Cir. June 27, 1988); *United States v. Bryant,* 480 F.2d 785, 790 (2d Cir.1973). In accordance with that standard, and on the basis of the record before me, I have concluded that all of defendants' objections on grounds of inaudibility, insofar as they relate to tapes not suppressed by Judge T. Emmet Clarie, are overruled, with the exception of the objection to the conversation designated as Vega Baja 157, as to which the objection is sustained.

A Ruling on Defendants' Objections to Electronic Surveillance Evidence on Grounds of Inaudibility, explaining fully the procedures and substance of this determination, will be forthcoming.

It is so ordered.