**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 91-2264

United States of America,

Plaintiff-Appellee

VERSUS

Rafael Valencia and
Luis Arturo Penaflor,

Defendants-Appellants

Appeal from the United States District Court
For the Southern District of Texas

(March 25, 1992)

Before WILLIAMS and WIENER, Circuit Judges, and LITTLE, District
Judge.[*]

WIENER, Circuit Judge:

Defendants-Appellants Rafael Valencia and Luis Arturo Penaflor
appeal their convictions on one count of conspiracy to possess with
intent to distribute in excess of one kilogram of heroin and on one
count possession with intent to distribute in excess of 100 grams
of heroin.  Finding no reversible error, we affirm.

I.

---

[*]District Judge for the Western District of Louisiana,
sitting by designation.

FACTS

In 1989, the Drug Enforcement Agency (DEA) began an investigation of Javier Carrasco after receiving a tip from a government informant, Gonzalez Marquez (also known as Rudy Lopez). Marquez had participated in several telephone conversations and had met with Carrasco in Arizona to negotiate the sale of 16 kilograms of heroin. Valencia was present at the meeting between Carrasco and Marquez. Several months later, Carrasco telephoned Marquez from Mexico to advise him that a two kilo sample of the heroin was ready for transportation into the Tucson area. Carrasco gave Marquez a telephone number to call in Tucson to arrange for the delivery. When Marquez made the call, Penaflor answered the phone and acknowledged Marquez's identity. Marquez then spoke with Valencia and asked Valencia if he could read a map. In response, Valencia said that Penaflor could read and speak English. Marquez then spoke with Penaflor, who informed Marquez that "they"[1] would arrive in Houston on a certain date, and explained that, once they arrived in Houston, Carrasco's sister-in-law would call Marquez to give him the hotel room and phone number where Penaflor could be reached.

On the appointed date, Carrasco's sister-in-law was contacted and she provided the expected information. When Marquez called the hotel room, Valencia answered. They arranged to meet at the hotel

---

[1]Marquez's testimony as to who "they" are is unclear. Apparently, he expected Carrasco to come to Houston to meet with him because later, at the meeting, he asked Valencia and Penaflor why Carrasco did not make the trip. Valencia then explained that Carrasco had sent Penaflor in his place.

room.  Shortly thereafter, Marquez went to the hotel room, and Valencia and Penaflor were present.

Valencia left the room and returned about ten minutes later with a speaker box he had removed from his truck.[2]  Penaflor hit the speaker to open it, and Valencia removed a plastic bag and said, "Here it is and it's good."  Penaflor added, "It smells good."

Valencia broke off a piece for Marquez to examine.[3]  Marquez explained that he would take the sample, test it, and return later with the actual purchasers.  According to Marquez, the Defendants expressed concern about remaining in a strange place with the heroin, indicating that they did not want to keep the drugs in the room.

Later that day, in a tape recorded telephone conversation in Spanish, Marquez complained to Carrasco that he did not get the two kilos as promised, and that its purity was only 13 percent.  Marquez said he could give Carrasco only $8,000.  Carrasco promised the additional kilograms in eight days, and instructed Marquez to give the money to Valencia because Valencia was in charge.

Two DEA agents posing as buyers accompanied Marquez to the same hotel.  While one of the agents remained in the car, Marquez and the other agent met with Valencia and Penaflor in the same room as before.  Because the agent spoke no Spanish and Valencia spoke

---

[2]Marquez recognized the truck as the same one Carrasco had driven to their earlier meeting in Arizona.

[3]This piece was later determined in a lab test to be 4.06 grams of heroin.

3

no English, Penaflor acted as interpreter. The agent inquired as to the whereabouts of the heroin, and Penaflor informed him that Valencia would get it. Valencia left the room and returned shortly with a brown bag under his shirt.

The heroin was removed from the bag, and the agent began testing and weighing it. The agent protested that the heroin was not very good, but both Defendants responded that it was "excellent stuff." The Defendants expressed concern when they were informed that they would only be receiving $8,000 for what amounted to 239.2 grams of heroin. Attempts were made to reach Carrasco by telephone, and someone at his number assured Valencia to his satisfaction that $8,000 was the agreed price.

The Defendants also informed the agent that they would personally be delivering the remaining kilograms of heroin on behalf of Carrasco in several weeks. Penaflor, still concerned about the price shortage, argued with Valencia. As Marquez and the agent were leaving, some discussion took place about the additional kilos, and Penaflor stated, "Well, on that one I'm going to make more money."

Even though Marquez subsequently exchanged numerous telephone conversations with both Valencia and Penaflor over a period of several months, the DEA agents finally concluded that the agreed 16 kilo transaction was never going to take place. One of the DEA agents testified at trial, over the Defendants' hearsay objection, that the agents decided to arrest the Defendants after hearing from an informant that Carrasco was on the run because of an argument

with some narcotics traffickers.  The agent admitted that he did not know whether the report was accurate, but that the DEA had acted on the information.

## II.

### PROCEEDINGS

Valencia, Penaflor and Carrasco were indicted for conspiring to possess with intent to distribute in excess of one kilogram of heroin, in violation of 21 U.S.C. §§  841(a)(1), 841(b)(1)(A), and 846.  Valencia and Penaflor were also indicted for possession with intent to distribute in excess of one hundred grams of heroin, in violation of §§ 841(a)(1) and 841(b)(1)(B).  Valencia and Penaflor were tried together by a jury, and were convicted on both counts. Each was sentenced to 188 months of imprisonment on each count, to run concurrently, plus five years of supervised release on each count, to run concurrently, and deportation upon release from confinement.

Both Defendants timely appealed their convictions.

## III.

### ANALYSIS

A.  The Taped Conversation

At trial, the government sought to introduce into evidence and play for the jury an authenticated tape recording of the telephone conversation between Marquez and Carrasco that took place after Marquez first met with Valencia and Penaflor in the Houston hotel room.  The conversation was in Spanish, but an English transcript

5

had been prepared, the accuracy of which was originally questioned by the Defendants.  After conference and a review by the official court translators, the parties stipulated to the accuracy of a revised version of the English transcript.  The Defendants' attorneys joined in the government's request to play the tape, contending that the jury should hear the participants' tone of voice.  The district court disagreed.  After polling the jury and learning that one spoke Spanish and one understood "street" Spanish, the court concluded that the jury would be more confused than assisted, and that a limiting instruction requiring the jury to credit the official transcribed version over what they might think they heard on the tape would be fruitless.  As an alternative, the court allowed copies of the transcript to be given to the jury members, and the transcript to be read into the record in English with Marquez reading his part of the conversation and the prosecutor reading Carrasco's part.

On appeal, the Defendants urge that the district court erred in refusing to allow the tape to be played to the jury.  They contend here, as they did at trial, that the jury could have benefitted from hearing the oral demeanor of the participants, the hesitation in the voices, pauses, laughter, and other non-verbal traits that cannot adequately be transferred to paper.  The Defendants contend that Carrasco's oral demeanor demonstrates his hesitance or reluctance.

This is an issue of first impression in this circuit. In United States v. Onori,[4] we considered the appropriateness of allowing a transcript of a taped conversation to be admitted as substantive evidence. We have also considered cases concerning the accuracy of the translation of a foreign language tape.[5] We have not, however, had to decide the propriety of admitting the English translation of a foreign language tape as evidence while excluding the tape itself, or to consider the relevance of a foreign language tape under such circumstances. After careful consideration, however, we conclude that here the district court did not err in refusing to play the tape for the jury.

The issue in this case is not whether the transcript can be admitted into evidence without the tape. Because of the unusual nature of this case, however, that issue is a predicate to our analysis of the Defendants' argument that the tape should have been played as it would have been helpful to the jury. There is no question that a transcript of a taped conversation is beneficial to a jury, and is generally used to assist the jury as it listens to the tape in court.[6] In Cruz, the Eleventh Circuit explained that

> Onori makes clear that transcripts may be used as substantive
> evidence

---

[4]535 F.2d 938 (5th Cir. 1976); see also United States v. Sutherland, 656 F.2d 1181 (5th Cir. 1981); United States v. Cruz, 765 F.2d 1020 (11th Cir. 1985).

[5]See, e.g., United States v. Llinas, 603 F.2d 506 (5th Cir. 1979), cert. denied, 444 U.S. 1079 (1980); Onori, 535 F.2d at 948–49.

[6]Onori, 535 F.2d at 947.

7

to aid the jury in determining the real issue presented, the content and the meaning of the tape recordings.

It is therefore incorrect to think of the transcripts as simply an "aid"--as better lighting fixtures in the courtroom would be an "aid" to the jury's vision of witnesses--and not as evidence of any kind. They are evidence and, like other evidence, may be admitted for a

8

limited purpose only.[7]

Cruz and Onori instruct that a transcript is admissible because it is helpful in understanding the tape recording from which it was derived.[8]  We find nothing in Cruz or Onori, however, that would prohibit a court from excluding the tape itself from being introduced into evidence while allowing the transcript.  In fact, we are aware of at least two cases in which English translation transcripts of foreign language tapes were introduced while the tapes themselves were not.[9]  In neither of those cases, however, did the parties object to the introduction of the transcripts without the tapes.[10]

Because we have concluded that an English translation transcript can be introduced into evidence without admitting and playing the underlying foreign language tape for the jury, we must now determine whether here the district court abused its discretion

---

[7]Cruz, 765 F.2d at 1023 (quoting Onori, 535 F.2d at 947).

[8]The Cruz court did give some credence to the Defendants' arguments:  when listening to a foreign language recording, the jury can "detect changes in voice modulation and note any hesitancies or other characteristics which might give meaning to the tape recordings."  Cruz, 765 F.2d at 1024.

[9]See  United States v. Rizk, 842 F.2d 111 (5th Cir.), cert. denied 488 U.S. 832 (1988); United States v. Rengifo, 789 F.2d 975 (1st Cir. 1986).

[10]In Rizk, the defendant never requested that the tape be played at trial.  For this reason, we rejected his assertion that he was prejudiced because the jury did not listen to the tapes. Rizk, 842 F.2d at 112.

9

when it refused to allow the tape to be played for the jury following requests to do so from both the government and the Defendants.

Whether to allow the tape to be played for the jury or introduced into evidence, like most evidentiary matters, is soundly within the discretion of the trial court.[11]  It bears repeating that, to be relevant in the determination of a case, the evidence must aid the jury in its decision making process.[12]  Even though evidence is relevant, however, it may be excluded if the trial court finds that its probative value is substantially outweighed by danger of unfair prejudice or confusion, or if such evidence would be misleading to the jury.[13]

Notwithstanding the Defendants' contention that the jury should listen to the tape to examine the participants' oral demeanor, the district court concluded that the tape would not aid the jury.[14]  The court emphasized that the Defendants and the government had stipulated to the accuracy of the transcript and that, at the request of the Defendants, during voir dire of the jury panel the court instructed the potential jurors who understood Spanish to disregard their understanding of Spanish in favor of the

---

[11]Addison v. United States, 317 F.2d 808, 815 (5th Cir. 1963), cert. denied, 376 U.S. 905 (1964).

[12]Fed.R.Evid. 401.

[13]Fed.R.Evid. 403.

[14]The district court commented, "Well, if it was in Chinese, I don't think I'd get the flavor from it; and I don't think this jury will get any more flavor than they can from the transcript."

10

official English translation presented to them during the course of the trial. Under those circumstances, the court concluded that the jurors, presented with a Spanish language tape and with an instruction to disregard its words in favor of an English translation, would be unaided by the tape.

When both a tape and a transcript are admitted, or a transcript is used by the jury as an aid when listening to the tape, the jury is generally given a limiting instruction that if it encounters a discrepancy between the tape and the transcript, the tape controls.[15] Of course, such a limiting instruction is only useful when the jury can understand the tape itself.[16] And, in this case, the limiting instruction would have been the obverse: that when the Spanish speaking jurors encountered a discrepancy, the transcript, not the tape, controls.

Moreover, the district court also expressed concern that the tape could result in the jury being misled or confused because two of the jurors could speak Spanish. They might be tempted, reasoned

_____

[15]United States v. Larson, 722 F.2d 139, 145 (5th Cir. 1983), cert. denied, 466 U.S. 907 (1984).

[16]The court in In re Audibility of Certain Recorded Conversations (United States v. Gerena), 691 F.Supp. 588, 592 (D.C. Conn. 1988), in commenting on the futility of such limiting instructions, stated, "Where the tapes are in a language other than English, however, such instructions have an air of the unreal, not to say the surreal. Transcripts in a language other than English will almost invariably be useless to the jury; the jury will need translations. And a jury cannot very well follow the tapes where they conflict with translations if the jury does not understand the language of the tapes." See also, United States v. Camargo, 908 F.2d 179, 193 (7th Cir. 1990). Of course, in the instant case, most of the difficulty is derived from the fact that two of the jurors could understand Spanish.

11

the court, to provide their own gloss on the translation, irrespective of the court's earlier admonishment during voir dire or any other limiting instruction the court might provide. The court concluded that excluding the tape entirely should alleviate the concern that the Defendants had exhibited when they requested the voir dire instruction initially. We are not convinced, under the facts of this case, that the tape itself would not have aided the jury in its deliberations. Rather, we agree with the court in Gerena, which observed that

> [i]n most cases little or no purpose would be served by playing to a jury in a United States courtroom a tape of a conversation in a language other than English. It is arguable, however, that the particular circumstances of a case would make it material and relevant to play such a tape to a jury that does not understand the substance of the conversation to show the mood or tone of the speakers, or the general context or ambiance of their conversation.[17]

Regardless of our disagreement on that point, however, we do not find that the district court abused its discretion. The Defendants have asserted that by listening to the tape the jurors would be able to infer from the "oral demeanor" that Carrasco was reluctant or hesitant. The transcribed translation, as stipulated to by the parties, indicates no reluctance or hesitance. Even though we understand the Defendants' argument that the "entire" conversation was not represented by the transcript, we note that the tape was authenticated by Marquez, who was one of the participants, and that he and the government's attorney read the transcript into the record. The tape was not admitted into

---

[17]691 F.Supp. at 607 n.9.

12

evidence, even on a proffer, so it does not form a part of the record on appeal.  Moreover, the Defendants have failed to direct our attention to any point in the transcript at which we might find such evidence of oral demeanor on the tape were it available to us.

Furthermore, in his testimony on direct examination, Marquez clarified many terms and parts of the conversation.  The Defendants' attorneys cross-examined Marquez on the taped conversation, and also called on Marquez to clarify idioms and references in the conversation, but never once did either inquire as to Carrasco's "oral demeanor" or the tone of the conversation, even though such testimony would have been well within Marquez's purview.[18]

The district court also expressed concern that whatever relevance the tape may have had was substantially outweighed by the danger that it would confuse or mislead the jury.  The Defendants requested that the court admit the tape and give the jury a limiting instruction, similar in content to the one given the jury venire, that the jurors should disregard their knowledge of Spanish, to the extent they had any, in favor of the transcript. The court, however, voiced doubts as to the efficacy of such an instruction.

Just as we did not necessarily agree with the district court's conclusion that the tape would not be helpful to the jury, we do not necessarily agree that playing the tape would have confused or

---

[18]See United States v. Aiello, 864 F.2d 257 (2d Cir. 1988); Cf. United States v. Allibhai, 939 F.2d 244 (5th Cir. 1991), cert. denied, 117 L.Ed.2d 133 (1992).

misled the jury. In fact, we note with more than a passing interest that one witness in this case spoke no English, yet she was allowed to testify before the jury in Spanish while her testimony was simultaneously translated into English by an official court translator. Frankly, we fail to discern the difference between the playing of the foreign language tape to the jury and the testimony of this foreign language witness. Both instances appear to present the same potential to confuse or mislead the jury--that the two Spanish speaking jurors may confuse the two versions or fail to accept the English version as "official"; and that those two jurors may unduly influence their fellow jurors who do not speak Spanish.

But despite this apparent contradiction, we do not find that the district court abused its discretion in refusing to allow the tape to be played. We have long noted the particular discretion that a district court is allowed in determining just which evidentiary matters have the real potential of confusing the jury.[19] The court may reasonably have concluded that the probative value of the witness's testimony far outweighed any possibility that the jury would be confused or misled by the fact that her testimony was given in Spanish, while just as reasonably reaching the opposite conclusion with respect to the tape.[20]

_____

[19]United States v. Edelman, 873 F.2d 791, 795 (5th Cir. 1989).

[20]There is no record of any objection at trial to the testimony of this witness in Spanish. The relevance of the witness's testimony is not before us. We note only that the situations are analogous and seem to present the same dangers.

Although one could plausibly argue that the better, more consistent approach would have been to have the jury listen to the tape, just as the jury listened to the Spanish speaking witness, we cannot say that under the circumstances of this case the district court abused its discretion by refusing to play the tape for the jury.

B.    The Jury Instructions

In one of two counts to the indictment, the Defendants were charged with possession with intent to distribute in excess of 100 grams of heroin, but in the other count, they were charged with conspiring to possess with intent to distribute in excess of one kilogram of heroin.  The DEA, however, only recovered 239 grams of heroin in their meeting with Valencia and Penaflor.  The Defendants requested, and the court agreed, to include a jury instruction on the "lesser included offense" of conspiracy to possess with intent to distribute in excess of 100 grams of heroin.  After closing arguments, however, the court omitted any reference to a 100-gram conspiracy.  Both Defendants objected to the court's failure to give the instruction.  The Defendants now complain that they were deprived of their constitutional rights to a fair trial and effective assistance of counsel when the district court failed to give the requested jury instruction.  Specifically, they insist that the court's decision not to give the 100-gram instruction, without prior notice of such change, was a violation of Rule 30 of the Federal Rules of Criminal Procedure, which requires the court

15

to "inform counsel of its proposed action upon the requests [for jury instructions] prior to their arguments to the jury."

In evaluating a claim that the trial court violated Rule 30, we review the record to determine whether there has been "substantial compliance" with the requirement of advance notice, and whether the Defendants have been prejudiced by the violation.[21]

The district court explained to counsel after the jury charge that he declined to give the requested jury instruction because he believed that the amount was not relevant to the charge. The district court was correct. Quantity is not an element of the crimes proscribed by 21 U.S.C. §§ 841(a)(1) or 846, and only need be proved when the government seeks an enhanced penalty.[22] Furthermore, it is within the judge's discretion to include a special issue to the jury concerning the amount of contraband involved.[23]

---

[21]United States v. Robertson, 659 F.2d 652, 658-59 (5th Cir. 1981). The government argues that Defendants failed to preserve properly their objection because they did not complain in the trial court of a lack of prior notice and did not request reargument. Therefore, they assert that the convictions can only be overturned for "plain error." Fed.R.Crim.P. 30 and 52(b). We disagree. The record clearly indicates that the Defendants made known to the court their specific objections to the court's decision to omit the proffered instruction. We do not think it was necessary for the Defendants to also complain in precise terms that they lacked prior notice of the court's decision or to request reargument in order to preserve their objection for appeal.

[22]United States v. Brown, 887 F.2d 537, 540 (5th Cir. 1989); United States v. Gordon, 876 F.2d 1121, 1125 (5th Cir. 1989); United States v. Morgan, 835 F.2d 79, 81 (5th Cir. 1987).

[23]United States v. Campuzano, 905 F.2d 677 (2d Cir.), cert. denied, 111 S.Ct. 363 (1990); United States v. Owens, 904 F.2d 411 (8th Cir. 1990).

The Defendants argue that they were entitled to the 100-gram instruction because it is a "lesser included offense" to that of conspiring to possess with intent to distribute in excess of one kilogram and that the evidence was insufficient to prove that they were involved in a conspiracy with respect to more than 239 grams. We disagree for two reasons. First, the Defendants are only entitled to a lesser included instruction if 1) the elements of the lesser offense are a subset of the elements of the charged offense; and 2) the evidence at trial is such that a jury could rationally find the Defendants guilty of the lesser offense, yet acquit on the greater.[24] As we pointed out above, quantity is not an element of the crimes charged. The only difference between the two instructions is the quantity involved, therefore, the two "offenses" are in fact the same. In reality, the district court could have issued an instruction that included no quantity at all.[25] Therefore, the court's reference to the quantity in the jury instructions was more on the order of a special issue.[26] It was not an instruction on an element of the crime.

Second, our review of the record convinces us that there was more than enough evidence for a rational jury to find beyond a reasonable doubt that both Defendants were guilty of conspiring to possess with intent to distribute in excess of the greater amount--

---

[24]United States v. Browner, 889 F.2d 549, 551 (5th Cir. 1989).

[25]See Campuzano, 905 F.2d at 679.

[26]Cf. id.

17

one kilogram. The district court expressed the same belief when considering the Defendants' objection to the charge. Furthermore, the government presented no evidence, and suggested no theory, that there was a separate conspiracy to deliver only the 239 grams of heroin. Other than the delivery itself, neither Defendant has alleged any evidence that would have supported a conspiracy for the lesser amount.

Penaflor has challenged his conviction on the ground of insufficiency of the evidence. Valencia, on the other hand, does not challenge the sufficiency of the evidence against him on either of the two counts for which he was convicted. He maintains, however, that this has no effect on his omitted instruction claim because the standards for assessing the two are "diametrically opposed." He correctly asserts that in evaluating the sufficiency of the evidence, an appellate court must sustain the conviction if, viewing the evidence in the light most favorable to the government, a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt.[27] But, he observes, the inquiry is reversed when the defendant complains that the court has failed to give an instruction to the jury: A defendant is entitled to an instruction on his defensive theory if there is any foundation in the evidence.[28] Presumably, Valencia's defensive

---

[27]United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), aff'd 462 U.S. 356 (1983).

[28]United States v. Cordova-Larios, 907 F.2d 40, 42 (5th Cir. 1990).

theory is that if he is guilty of any offense, it is of a conspiracy with regard to just the 239 grams delivered.

We reject Valencia's argument for two reasons. First, we find nothing in the jurisprudence that would allow us to accept the proposition that guilt of a lesser included offense is a defense to the greater offense. Second, we find no foundation in the evidence for Valencia's defensive theory, if indeed it is a defensive theory at all.

The Defendants further complain that their right to effective assistance of counsel was violated because closing arguments were presented without the benefit of knowing a lesser-included offense charge would not be given. It is not enough, however, to show merely a violation; the Defendants must demonstrate an actual resulting prejudice that would affect the outcome of the case.[29] Valencia argues that had his attorney known of the court's decision before argument, she would have concentrated on Valencia's innocence rather than on the amount of drugs involved in the conspiracy. But the record confirms that counsel did argue to the jury that the evidence did not support a conspiracy conviction, and suggested that Marquez's testimony was fabricated or "embellished." Valencia even suggested that the agents misidentified him, and that Defendants did not know that the substance they were carrying was heroin. Furthermore, as we noted above, Valencia has not challenged the sufficiency of the evidence with respect to the

---

[29]Strickland v. Washington, 466 U.S. 668, 687 (1984).

charge of conspiracy to possess with intent to distribute in excess of one kilogram.

Penaflor's argument was completely void of any comments concerning a lesser-included conspiracy. He simply argued that he was not a participant in any conspiracy. Any error in misleading Penaflor's counsel was harmless.

We cannot see how the outcome of the case would have been different had the court given the jury the requested lesser included instruction, even if the Defendants had been entitled to such a charge. The evidence was clearly sufficient to convict both Defendants on both counts, and the Defendants were not deprived of effective assistance of counsel. The district court substantially complied with the advance notice requirement of Rule 30, and did not err when it failed to include the lesser included instruction in the jury charge.

## C. The Hearsay Statements

During the trial, one of the two DEA agents involved in the investigation testified that after waiting for months the DEA had finally decided to arrest the Defendants because "I was told by the informant that had made some calls to associates of Javier Carrasco that Javier Carrasco couldn't be found in Mexico. He was on the run is what the terms was used because he had some arguments with other narcotics traffickers in Mexico. Whether it was true, I don't know." The Defendants objected at that time and continue to assert on appeal that the agent's comments were inadmissible hearsay. We disagree. These comments were offered, not for the

truth of the matters asserted--the agent himself maintained that he did not know if the statements were true--but to explain why, after waiting nine or ten months following the drug transaction, the DEA decided to arrest the Defendants.  That is the basis on which the district court allowed the statements.  We agree that the statements were not hearsay and therefore were admissible.

## III.

## CONCLUSION

The district court did not abuse its discretion in admitting the English transcript of the tape of the Spanish language telephone conversation into evidence while refusing to allow the tape itself to be played for the jury.  Neither did the district court err when, despite its earlier indication to the contrary, it omitted a proffered instruction on a lesser included offense because mere lesser quantity is not a lesser included offense; and there was sufficient evidence to support conviction on the one-kilogram conspiracy charge.  Finally, the court did not err in allowing a DEA agent to recount a conversation with an informant to explain why the DEA waited months to arrest the Defendants.  The statements were not hearsay because they were not offered to prove the truth of their content, only that the action of the DEA was made in reliance on the statements irrespective of their truth.

For the foregoing reasons, the judgment of the district court is AFFIRMED.