IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-41040
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AUSBY JAMES GILBERT, also known
as Eddie Willis, also known as
Teddy Gilbert; DERRICK WAYNE BURTON,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Texas
(1:97-CR-153-7)
_____

October 21, 1999

Before REYNALDO G. GARZA, JOLLY, and WIENER, Circuit Judges.

PER CURIAM:[*]

    The defendants, Derrick Wayne Burton and Ausby James Gilbert
(a/k/a Teddy Gilbert), appeal their convictions and sentences for
distributing, and conspiracy to distribute, marijuana and crack
cocaine in violation of 21 U.S.C. §§ 841 & 846.  Following an FBI
investigation, the defendants were indicted and convicted of
engaging in a conspiracy to distribute marijuana and crack cocaine
throughout Beaumont, Texas, between the years 1995 and 1997.  The
defendants assert that their indictment was insufficient, that the
jury's verdict was not supported by sufficient evidence, that the

_____

    [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

district court committed various errors during trial, and that the district court relied on untrustworthy evidence in calculating their sentences. Finding no error, we affirm.

I

A

On March 15, 1997, the police were called to the Beaumont Hilton Hotel to assist hotel security in evicting the occupants of a room for violating hotel policy. Both hotel personnel and the police officers testified that there was smoke and a strong odor of marijuana emanating from the room. The hotel security and the police knocked on the door twice and identified themselves. The police officers testified that, although there was no answer, they could hear noises coming from inside the room consistent with the destruction of evidence. After one failed attempt, the police were able to enter the room and discovered it was occupied by four adults, Roger Andrus, Michael Gerard, Steven Jones, and Derrick Burton, and one juvenile, Linton Arceneaux. A search of the room revealed three bags of marijuana, loose marijuana on an end table, a bottle containing PCP, marijuana on the person of two of the occupants, and two plastic bags containing crack cocaine cookies weighing 365.75 grams. Additional marijuana and PCP were found in a small sitting area adjacent to the bedroom and in the toilet.

When the police entered the hotel room, Burton was sitting on the bed with one bag of crack cocaine cookies within arm's reach. A second bag of crack cocaine cookies was found between the

2

headboard and the mattress of the same bed, along with a marijuana cigarette. Based on the quantity of crack cocaine found in the hotel room, the FBI became involved in the investigation. It revealed that a conspiracy to distribute crack cocaine in Beaumont, Texas, had begun sometime in 1992. Initially, the conspiracy involved the purchasing of crack cocaine by Roger Andrus and Brandon Biagas from Chris Wilkes in varying amounts and distributing it to individuals in Beaumont. Approximately in March 1994, Andrus and Biagas met Mark Cooksey. They began purchasing crack cocaine from him in Houston, Texas, to sell in Beaumont. Andrus and Biagas began by purchasing approximately two ounces of cocaine each from Cooksey a week, but the purchases eventually escalated to approximately eighteen ounces every two weeks. The relationship with Cooksey lasted between six months and one year.

Co-defendant Marcus Ephron also participated in some of the trips to Houston and began making purchases for himself from Cooksey. During the final trips to Houston to purchase cocaine, Andrus and Biagas hired John Gobert to drive a separate car to Houston and to take the cocaine back to Beaumont with him. As a result of the relationship with Cooksey, Andrus and Biagas met Tony Scott and began buying cocaine from him. In approximately April 1995, the defendant, Derrick Burton, began traveling to Houston with Andrus, Biagas, and Ephron to purchase cocaine from Cooksey and Scott. Burton would pool his money with Ephron, and they would

purchase nine ounces of crack from Scott on a bi-monthly basis. This crack was transported to Beaumont and distributed.

In approximately October of 1995, the defendant, Ausby James Gilbert, became involved with the group. He would transport the drugs purchased by Andrus, Biagas, Ephron, and Burton from Houston to Beaumont in a separate car. At that time, Biagas and Andrus were each obtaining and distributing approximately 15-18 ounces of crack cocaine a week. Additionally, sometime between October 1995 and April 1996, Scott set up a contact person in Houston from whom the group began purchasing marijuana.

Beginning in May 1996, Andrus and Biagas each began purchasing one-half kilogram of crack cocaine a week from Scott in Houston. After purchasing the powder, they would return to Beaumont, cook it into crack for resale, and distribute it. The defendants, Burton and Gilbert, were involved actively in distributing the crack cocaine. This activity continued until January 1997, when Scott went to prison.

In January 1997, Andrus and Biagas began dealing with a person they knew as "JoJo." Andrus and Biagas, accompanied by Ephron and Burton, would drive to Houston, purchase the cocaine, and return to Beaumont to distribute it. In May 1997, while still purchasing approximately one-half kilogram of cocaine a week from "JoJo," the members of the group pooled their money and attempted to purchase two kilograms of powder cocaine from Cooksey. Gilbert and Burton were given $30,000 to purchase the cocaine and to transport it from

4

Houston to Beaumont.  Cooksey met with Gilbert and Burton and took the money, but never returned with the cocaine, telling them that he had been robbed.  After that, Andrus was out of money, but Burton and Biagas continued to purchase cocaine from "JoJo" in the amount of one-fourth kilogram of powder a week until June 1997.  In total, the evidence revealed that more than 200 kilograms of crack cocaine and an unspecified amount of marijuana were distributed between 1992 and 1997.[1]

Additionally, evidence was introduced at trial regarding a traffic stop on February 7, 1997, in Chambers County, Texas (a county between Beaumont and Houston).  The evidence showed that during a routine traffic stop, officers discovered marijuana residue and codeine in a vehicle driven by Burton and transporting Andrus, Ephron, and a juvenile.  Further, evidence was introduced regarding correspondence between Burton and Ephron while they were awaiting trial on charges stemming from the traffic stop.  Specifically, a letter referencing the conspiracy addressed to Ephron from Burton was introduced stating: "[i]f them hoes (referring to the FBI) try to talk to you, don't tell them shit . . . [and] don't be talking to nobody in here about the case, cause they got a whole bunch of snitches in here."[2]

---

[1]The testimony at trial of several members of the conspiracy, including Brandon Biagas, Tony Scott, Marcus Ephron, Michael Gerard, and Steven Jones, confirm these basic facts.

[2]Additional evidence was also presented of various arrests of the parties involved in the group.  Evidence was present regarding offenses involving crack cocaine and other controlled substance

The defendants, Burton and Gilbert, along with Roger Andrus, Steven Jones, Michael Gerard, Marcus Ephron, and Brandon Biagas were indicted on various charges stemming from their involvement in the conspiracy to distribute and possess with intent to distribute marijuana and crack cocaine.[3]  Specifically, Burton and Gilbert were charged with conspiracy to distribute and possess with intent to distribute marijuana and crack cocaine in violation of 21 U.S.C.

---

during the time frame of the conspiracy.  One of these arrests included the sale of 3.37 grams of cocaine base by Gilbert to an undercover Beaumont police officer.

[3]On September 24, 1997, a federal grand jury returned a two-count indictment against Burton, Andrus, Jones, and Gerard for conspiracy to distribute and possess with intent to distribute marijuana and crack cocaine on or about March 1, 1997 until March 15, 1997, in violation of 21 U.S.C. §§ 841(a)(1) & 846, and for possession with intent to distribute crack cocaine on March 15, 1997, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(D).  A superseding indictment was returned on October 22, 1997, against the same four defendants, adding another defendant, Marcus Ephron, in Count I (conspiracy) and adding a substantive count for possession with intent to distribute crack cocaine on September 8, 1996, against Ephron (Count III).  The superseding indictment also made minor changes to the name of one of the defendants and amended the length of the conspiracy to on or about September 8, 1996 until about March 15, 1997.  On December 18, 1997, a second superseding indictment was returned by the same grand jury adding two additional defendants, Ausby Gilbert and Brandon Biagas.  The indictment also enlarged the period of the conspiracy to on or about January 1, 1996 until March 15, 1997.  Gilbert was charged with Count I of the indictment (conspiracy), and Count III regarding possession with intent to distribute crack cocaine on August 17, 1996.  Various other changes were made to the second superseding indictment, but none of them affected either Gilbert or Burton.

§§ 841(b)(1)(A)[4] & 846[5] (Count I). Additionally, Burton was

[4]21 U.S.C. § 841 states in relevant part:
(a)Unlawful acts
Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--
(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance; or
(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.
(b) Penalties
Except as otherwise provided in section 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
(1)(A) In the case of a violation of subsection (a) of this section involving--. . .
(ii) 5 kilograms or more of a mixture or substance containing a detectable amount of --
(I) coca leaves, except coca leaves and extracts of cocoa leaves for which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;
(II) Cocaine, its slats, optical and geometric isomers, and salts of isomers; . . .
such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $4,000,000 if the defendant is an individual . . .
(C) In the case of a controlled substance in schedule I or II, or 1 gram of flunitrazepam, except as provided in subparagraphs (A), (B), and (D), such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of the authorized in accordance with the provisions of Title 18, or $1,000,000 if

indicted for possession with intent to distribute crack cocaine on March 15, 1997, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A) (Count II), and Gilbert was indicted for possession with intent to distribute crack cocaine on August 17, 1996, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C) (Count III).

All of the defendants except Burton and Gilbert entered guilty pleas to the various charges prior to April 6, 1998. On April 7, 1998, Burton and Gilbert were tried. The jury returned a guilty verdict against them on Count I for conspiracy to possess with intent to distribute both marijuana and cocaine base pursuant to 21 U.S.C. § 846,[6] on Count II as to Burton, and on Count III as to Gilbert. On August 18, 1998, Burton was sentenced to 235 months imprisonment followed by five years of supervised release. Gilbert was sentenced to 262 months imprisonment followed by five years of supervised release. Both defendants filed timely notices of appeal.

C

---

the defendant is an individual. . . .

[5]21 U.S.C. § 846 states:
Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those proscribed for the offense, the commission of which was the object of the attempt or conspiracy.

[6]Burton was convicted for his role in the conspiracy from April 1995 through July 1997. Gilbert was convicted for his role in the conspiracy from October 1995 through July 1997.

8

After carefully reviewing the issues on appeal raised by the separate appellate briefs filed by Burton and Gilbert, we can reduce the questions to ten: (1) Was the indictment insufficient because it did not state with specificity the amounts and types of controlled substances involved in the conspiracy; (2) Was the evidence presented to the jury sufficient to support its verdict; (3) Did the district court err in admitting into evidence the testimony of Gerard and Scott in the light of defense counsel's invocation of Federal Rule of Evidence 615; (4) Did the district court err in admitting into evidence the plastic bags containing the drugs seized for the Hilton Hotel, along with a slip of paper stating where in the room the drugs were found;[7] (5) Did the district court err in denying defense counsel an opportunity to question Biagas regarding his plea agreement with the government;[8]

---

[7]Burton asserts that the district court abused its discretion when it admitted into evidence five plastic bags containing the drugs seized from the Hilton Hotel on March 15, 1997. Burton argues that because the bags contained a slip of paper indicating where the collecting officer (Officer Roberts) found the drugs in the hotel room, the evidence constituted hearsay and was erroneously admitted. Officer Roberts testified that upon arriving at the Hilton, he found marijuana throughout the room. He testified that he gathered the drugs and put them in separate bags, placing a piece of paper in each bag indicating where the drugs were found. The decision of the district court to admit this evidence did not amount to an abuse of discretion. Further, even if the admission of the evidence was in error, it was harmless in the light of the mountain of evidence adduced at trial against Burton.

[8]Gilbert asserts that the district court improperly prevented his trial counsel from questioning Brandon Biagas with respect to his plea agreement. The record indicates that the government met its requirements under Giglio v. United States, 405 U.S. 150 (1972), by providing to the defense details of the plea agreement

9

(6) Did the district court properly prevent Biagas from responding when he was asked to make a legal conclusion;[9] (7) Did the district court err in relying on the contents of the PSR to determine the amount of controlled substance involved for purposes of sentencing; (8) Were statements made by the government during closing argument improper, thus resulting in prejudice;[10] (9) Did the district court

---

between the government and Biagas prior to offering his testimony into evidence. Further, the record indicates that Gilbert's trial counsel was given wide latitude to delve into the plea agreement, and to elicit from Biagas the exact terms of the agreement and what promises were made by the government in return for pleading guilty. However, our precedent clearly establishes that the defendant's trial counsel is not permitted to delve into the negotiations surrounding the plea agreement and the conversations between the party accepting the plea agreement and his counsel. See United States v. Robertson, 582 F.2d 1356, 1366 (5th Cir. 1978)(stating any discussions characterized as plea negotiations are inadmissible evidence). As such, the district court was correct when it prevented Gilbert's attorney from questioning Biagas with respect to the offers made to him during the plea negotiation, and as to the advice his counsel provided to him.

[9]Gilbert asserts that the district court improperly limited his cross-examination of Biagas when it prevented him from asking Biagas whether he thought he was involved in a "conspiracy." The government objected to this question because it called for a legal conclusion by an non-expert witness. The court sustained the objection. Based on United States v. Southers, 583 F.2d 1302 (5th Cir. 1978), it is clear that the trial court may prevent a lay witness from answering a question that calls for a legal conclusion. Id. at 1306 (holding that "bank officials were properly not permitted to give their opinion on the question of 'intent' and 'defraud'" because those terms have "particular legal construction"); See also, United States v. Baskes, 649 F.2d 471, 478 (7th Cir. 1980)(holding that if the court determines that any question requires an understanding of the nature and scope of the law, it may properly preclude a response that would not be helpful to the tier of fact). Thus, given the wide latitude afforded the district court in such matters, it did not abuse its discretion in sustaining the government's objection.

[10]After reviewing Burton's assignments of error, it is clear that even if the government's remarks were improper, they certainly

err by not requiring the government to honor its alleged plea agreement with Gilbert; and (10) Did the district court err by striking a member of the jury pool for cause.[11]  Finding no error, we affirm.

III

A

---

would not rise to the level required to demonstrate prejudice. Burton's first two points of error refer to statements made by the government in response to his trial counsel's characterization of evidence and regarding Burton's veracity.  Our precedent clearly establishes that trial counsel is free in closing argument to point out any conflicting view of the evidence.  See United States v. DeLaRosa, 911 F.2d 985, 992 (5th Cir. 1990).  Burton's third point of error asserts that the government attempted to make the district judge the "thirteenth juror" by making statements such as: "the judge also charges you," and "the judge will tell you."  Such reference to the jury instructions by the government during its closing argument are clearly proper.

[11]Determinations as to the impartiality of a juror lie in the discretion of the trial judge and will not be grounds for a reversal of a conviction absent abuse of discretion.  See United States v. McCord, 695 F.2d 823, 828 (5th Cir. 1983).  The following exchange occurred between the court and juror Hanks:
Hanks: Practically my whole family is in federal jail.
Court: There're all in . . . .
Hanks: My dad, two of my brothers, and one have gotten out.  They were sentenced for conspiracy to distribute marijuana, cocaine, and to conspiracy to murder and to murder after the fact.
Court: Well, I have a very basic question to ask you. That is, can you be fair and impartial with all of that?
Hanks: Probably not.  Not in a criminal case, I couldn't.
Court: You cannot put that aside?
Hanks: No.  Because in the back of my mind I'm always gonna have these questions.  A lot of stuff my family did, they need to be there, but a lot of stuff they didn't do what they was charged with.  And that's gonna be in the back of my mind . . . .
Based on this testimony, the district court did not abuse its discretion in striking this potential juror.

11

Burton's first point of error is that the district court erred in denying his objection asserting that the quantity and type of controlled substances were not alleged as an element of the offense under 21 U.S.C. § 841. Thus, because the type and quantity of each controlled substance was not contained in the indictment, Burton asserts he could not be found guilty of an "aggravated drug amount," but "is guilty--if at all--of the lowest grade of the controlled substance offense." Our precedent is clear that drug type and quantity under 21 U.S.C. § 841 are sentencing factors and are not elements of the offense that must be alleged in the indictment. See United States v. Castillo, 77 F.3d 1480, 1486 (5th Cir. 1996); United States v. Valencia, 957 F.2d 1189, 1197 (5th Cir. 1992).[12]

---

[12]Burton urges the court to reconsider these holdings in the light of the Supreme Court's holding in Jones v. United States, -- U.S. --, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). In Jones, the Court addressed the question of how an ambiguous federal criminal statute should be construed. The statute was unclear in delineating the elements of the offense from the sentencing factors. Rather than striking the statute as unconstitutional, the Court applied the analysis of "constitutional doubt" to construe the statute, that is, where a given construction of a statute would raise constitutional doubts as to its validity, the court should adopt an alternative construction if available. In Jones, the Court clearly limited its analysis to ambiguous statutes, and expressly recognized "the principle that the definition of the elements of a criminal offense is entrusted to the legislature." Jones, 119 S.Ct. at 1224 n.6 (citation omitted); see also, United States v. Hudson, 7 Cranch 32, 3 L.Ed. 259 (1812); Staples v. United States, 511 U.S. 600, 604, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); United States v. Castillo, 179 F.3d 321, 327-28 (5th Cir. 1999)(stating that we look to the "language, structure, subject matter, context, and history [of a statute] in determining whether or not Congress intended for a statute to define a separate crime or to set forth a separate sentencing factor"). Further, the Court unequivocally stated that "our decision today does not announce any

Both defendants argue that the evidence presented to the jury is insufficient to uphold the conspiracy charge. Further, Burton argues that the evidence supporting his conviction for possession with intent to distribute crack cocaine was insufficient. Because neither Burton nor Gilbert renewed their motions for judgment of acquittal at the conclusion of the presentation of their evidence, we review the sufficiency of the evidence under a plain error standard. See United States v. Pariente, 558 F.2d 1186, (5th Cir. 1977); United States v. McCarty, 36 F.3d 1349, 1358 (5th Cir. 1994). Under the plain error standard, the court will reverse the district court's judgment only where a "manifest miscarriage of justice" occurs. Id. "Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." Id. (citations omitted); See also, United States v. Ruiz, 860 F.2d 615, 617 (5th Cir. 1988).

Each element of the conspiracy was proved through the trial testimony of co-conspirators Biagas, Scott, Ephron, Gerard, and Jones. The co-conspirators testified specifically that Burton and

_____

new principle of constitutional law, but merely interprets a particular federal statute . . . ." Jones, 119 S.Ct. at 1228 n.11. 21 U.S.C. § 841 clearly separates the elements of the crime ("Unlawful acts" set out in section (a)) and the sentencing factors ("Penalties" set out in section (b)). Thus, because the statutory ambiguity in Jones is not present in 21 U.S.C. § 841, the Court's holding in Jones does not call into question our holdings in United States v. Castillo, 77 F.3d 1480, 1486 (5th Cir. 1996) and United States v. Valencia, 957 F.2d 1189, 1197 (5th Cir. 1992).

Gilbert were among those who agreed to travel to Houston to purchase crack cocaine and marijuana and to bring it back to Beaumont for distribution.[13] Additionally, Tony Scott, one of the drug suppliers, testified with regard to drug purchases made by Gilbert, and about Burton's involvement in the conspiracy. Thus, after reviewing the evidence of Burton's and Gilbert's involvement in the conspiracy, we conclude that such evidence was clearly sufficient to support the guilty verdict.

Turning to Burton's contention that the evidence was insufficient to support the jury's finding on Count II of the indictment, charging him with possession with intent to distribute crack cocaine, we likewise find the evidence sufficient. At trial, the government introduced evidence showing Burton's physical

---

[13]Specifically, Biagas testified that Burton accompanied him and others to Houston to pick up crack cocaine and marijuana, and that they would return to Beaumont to sell it. He also testified with reference to Burton that he was well aware of the agreement to commit the unlawful act. With respect to Gilbert, Biagas testified that Gilbert began traveling to Houston in another vehicle, agreeing that he would transport the drugs to Beaumont in that vehicle. Biagas testified that Gilbert was compensated for these services with drugs and money. The testimony of Ephron was very similar to Biagas's in almost every respect. Additionally, Ephron testified that Burton began to purchase his own drugs on the trips, and would sell them upon return to Beaumont.

Tony Scott, one of Burton and Gilbert's crack cocaine suppliers, testified for the government and corroborated all of the co-conspirators' statements. He testified that Burton was definitely involved in the group that came from Beaumont. He further testified that he knew Gilbert to be the driver for the group that transported the drugs from Scott's home in Houston to Beaumont. He also testified that Gilbert made personal purchases on numerous occasions.

Further, a letter written by Burton to Ephron and introduced into evidence contained extensive references to the conspiracy.

14

proximity to the crack cocaine in the hotel room. Michael Gerard, a co-conspirator who was present in the hotel room on the night in question, stated that when he and Jones came to the hotel, and that Andrus, Burton, and the juvenile were already present. They began smoking marijuana and were about to dip a marijuana cigarette in some PCP when the police arrived. Burton, who already had a bag of crack cocaine, took a second bag from Andrus and attempted to hide both bags behind the bed. Furthermore, Steven Jones testified that Burton had control of the crack cocaine in the hotel room on the night in question. Finally, Sergeant Roberts of the Narcotics Unit of the Beaumont Police Department testified that, based on his training and experience, 13 ounces of crack cocaine--the amount found in the proximity of Burton--is a distributable amount, exceeding that which is normally held for personal consumption.

Based on this testimony showing Burton's control of the crack cocaine and the amount of crack cocaine found in the hotel room, the government met its evidentiary burden.

C

Both Burton and Gilbert assert that the district court erred in allowing the testimony of government witnesses Gerard and Scott, to which they objected under Federal Rule of Evidence 615. The basis for this claim stems from the fact that Gerard and Scott, along with Burton, were transported together from the prison to the courthouse. The government asserts, and the district court found, that Gerard and Scott only spoke in general terms about receiving

15

time cuts for their cooperation with the government in connection with the conspiracy, and generally about the areas they were going to testify to during Burton and Gilbert's trial.

Federal Rule of Evidence 615 states: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order on its own motion." FED.R.EVID. 615. The purpose of the rule is to "prevent witnesses from tailoring their testimony to that of another witness's testimony." Palmer v. Lares, 42 F.3d 975, 980 (5th Cir. 1995)(citing United States v. Wylie, 919 F.2d 969, 976 (5th Cir. 1990)). The district court's decision to admit testimony in contravention of Rule 615 is reversed only if its admission was an abuse of discretion and resulted in prejudice to the defendants. Palmer, 42 F.3d at 980. In determining whether the admission of testimony was an abuse of discretion, we should focus on "whether the witness's conversation concerned substantive aspects of the trial and whether the court allowed opposing counsel an opportunity to explore fully the conversation." Id. (citations omitted).

The district court performed a lengthy evidentiary hearing on this matter, allowing Burton and Gilbert's trial attorneys ample opportunity to explore the conversation fully. Further, Burton was present during the conversation in question and was unable to provide any testimony regarding its substance from which the district court could find an effect on the testimony of the witnesses. Moreover, Gerard testified during the evidentiary

16

hearing that he and Scott did not talk about the specifics of each other's testimony, but only in general terms.  Thus, the admission of this testimony was not an abuse of discretion.

D

With regard to their sentences, Burton and Gilbert assert that the district court erred in relying on the information contained in the PSR in determining the amount of controlled substances involved because the amounts were contested and the report lacked reliability.  Burton asserts that the district court erred in adopting the amounts of drugs as contained in the PSR because after he contested the amounts, the district court failed to make a detailed finding with regard to its basis for determining the quantity of controlled substance involved.

The district court found that the amount of drugs attributed to Burton in the PSR was calculated properly.  It adopted the facts set out in the PSR after concluding that they were supported by a preponderance of the evidence.  The court determined that because there were no drugs seized, it would have to approximate the quantity of controlled substance involved, as permitted by U.S.S.G. § 2D1.1, comment 12.  Further, Burton has failed to produce any evidence other than his bald assertions that the court erroneously calculated the amount of controlled substances involved during the conspiracy.  Thus, we hold that the district court's finding in Burton's regard was not clearly erroneous.

17

Gilbert challenges the reliability of the PSR, arguing that much of the evidence came from co-defendants who had cut deals with the government.  Gilbert asserts that because these parties could not provide any receipts, telephone records, pay sheets, beeper records, money lists, etc., which would substantiate their claim as to the amount of controlled substances involved, their claims lack the necessary indicia of reliability.  The record indicates that the district court conducted an inquiry concerning the information contained in the PSR and determined it to be "correct."  Thus, based on the record of this inquiry, we hold that the district court's determination as to the reliability of the information contained in the PSR was not clearly erroneous.

E

Finally, Gilbert argues that the district court erroneously denied his motion to compel the government to honor his plea agreement.  As a result of the government's failure to honor the plea agreement, he further argues that his due process rights were violated.  The plea agreement, Gilbert alleges, was entered into during the course of three separate pretrial meetings with the government, during which he was "under the assumption" that he was entering into a plea bargain.  On these occasions, Gilbert provided the government with information regarding the conspiracy and signed a proffer letter.  Gilbert concedes, however, that no formal written plea agreement was ever entered into by the parties.

Assuming the existence of an oral agreement between the government and Gilbert, Gilbert has been unable to demonstrate that he was prejudiced as a result of the government's failure to reduce the alleged agreement to writing and to honor it. During the evidentiary hearing conducted by the district court, Gilbert presented no evidence that he suffered any prejudice. Thus, because Gilbert has failed to demonstrate he detrimentally relied on the alleged plea agreement to his prejudice, his claim fails.

## III

In conclusion, we hold that Burton and Gilbert have failed to demonstrate reversible error in connection with their convictions and sentences. Thus, their convictions are in all respects

A F F I R M E D.